## The F. & P. M. No. 2.

CARTIER *v.* THE F. & P. M. No. 2., (FLINT & P. M. R. Co., Claimant.)

*(Circuit Court, E. D. Wisconsin.   October 1, 1888.)*

1. COLLISION—BETWEEN TUG AND STEAMER—TUGS—LIGHTS.
   A tug, having in tow a raft of logs about 600 feet long, and of sufficient width to fill the channel, arrived off the harbor at about 8:30 o'clock P. M. The night was dark and rainy, a slight sea was beginning to make, and the current was running strong out of the harbor. The tug exhibited the regulation green and red lights, and two vertical white lights indicating a tow; the lights being visible only from right ahead to two points abaft the beam. There was no light upon the raft, but there was a lantern in a yawl-boat at the rear of the raft. A propeller, approaching the harbor from the same direction, saw the light at the stern of the raft, which appeared to be about a quarter of a mile from the propeller, and to be that of a schooner at anchor. The tug observed the lights of the propeller, and sounded a danger signal, which the propeller supposed to have proceeded from some vessel in the harbor. A second signal was sounded, whereupon the propeller, unable to see any lights except the light in the yawl-boat, checked its speed, and, on the sounding of a third signal, made a circle in the lake, and then entered the channel, where it collided with the raft. The mate of the propeller saw no lights ahead on entering the channel, but heard the tug's exhaust, and knew therefrom that a tug with a tow was somewhere in the channel. *Held*, that U. S. Nav. Rule No. 12, requiring rafts navigating or moored in any bay, harbor, or river to carry one or more white lights, placed in the manner prescribed by the board of supervising inspectors of steam-vessels, did not authorize the regulation made by the board, that rafts in tow should carry certain white lights, and that the tug did not violate statutory regulations in not so lighting the raft.

**2. SAME.**

Under articles 23, 24, of the act adopting the revised regulations, (23 U. S. St. at Large, c. 354, p. 442,) providing that with respect to the regulations due regard shall be had to all dangers of navigation, and to all special circumstances rendering a departure from the rules necessary to avoid immediate danger, and that nothing in the rules shall exonerate any vessel from neglect to carry lights, or of the neglect of any precaution required by the ordinary practice of seamen, the tug was negligent in not exhibiting rear lights, which would indicate to the propeller her position, and that of her tow.

**3. SAME—OVERTAKING VESSEL.**

The propeller was negligent in entering the channel after the alarm signals were given, and after it had notice of the proximity of the tug and its tow.

In Admiralty. Libel for damages caused by a collision.

*G. C. Markham* and *O. T. Williams*, for libelant.

*F. M. Hoyt*, for claimant.

JENKINS, J. On the 18th day of September, 1886, at about 5 P. M., the tug Aldrich started with a tow from Hamlin, a point on the east shore of Lake Michigan, bound for Ludington, some six miles south. This tow consisted of a raft or boom of logs of from 225,000 to 250,000 feet in quantity, indifferently called a balloon, sag, or bag boom. The boom was composed of from 40 to 48 pieces of square timber, each of the length of about 35 feet, connected with each other at the ends by chains, and attached to the tug by a hawser of 600 feet in length. The logs floated unattached within this boom, and when in motion the boom naturally assumed a balloon shape; the logs floating to the stern of the boom, which at the forward end came nearly to a point. It was about 220 feet in width at the stern, and of the length of about 600 feet. The tug was 90 feet in length. The tug, with her tow, arrived off the Ludington piers at about 8:30 o'clock P. M. of that day. The night was very dark, and rain was falling. The wind was from the south-east, a slight sea was beginning to make, and the current was running strong out of the harbor. The tug exhibited the regulation green and red lights, and two vertical white lights, indicating a tow; these lights being visible only from right ahead to two points abaft the beam. There was also claimed to have been a light in the engine-room shining out through a window in the rear of the room. As the tow approached the piers there was no light upon the raft, but a laborer, with a lantern, was in a yawl-boat at the rear of the boom; his duty being to recover logs escaping therefrom. The tug with its tow was making headway at the rate of one and one-half miles an hour, and, as it neared the pier, took in some 300 feet of the hawser; making the distance from the stern of the tug to the stern of the raft about 900 feet. At the same time the propeller approached from the north, on her usual voyage from Manistee to Milwaukee, touching at Ludington, at the speed of from 10½ to 11 miles an hour. The lights of the tug were not visible to the propeller, but her captain saw the light at the stern of the raft, on the port bow, bearing about E. N. E. At the sounding of the second danger signal, hereafter referred to, this light appeared to him to be distant about a quarter of a mile from the propeller, and some 2,000 feet or more north of the north pier; to be stationary;

and to be that of a schooner at anchor. The lights of the propeller were observed by the tug, which sounded a danger signal. At this time the propeller was about one mile north-west from the piers, the tug being also outside, nearer to the harbor, and was about one-fourth of a mile inshore from the propeller. This danger signal was heard on the propeller, and was supposed to have proceeded from some vessel in the channel, or in the Pere Marquette lake, constituting the harbor at Ludington. The propeller kept her course, headed for the beacon-light on the south pier. Shortly thereafter the tug sounded a second danger signal, upon hearing which the captain of the propeller, unable to see any lights except the white light in the yawl-boat, checked his boat down, and hauled her up S. S. E. The captain of the propeller states that between the first and second alarms he had not proceeded a quarter of a mile, and, according to the captain of the tug, was one-half mile from the piers; and the tug, by the same authority, was some 300 feet from the Ludington pier-light, and had not entered the channel. There was a third alarm sounded when the propeller was about 1,000 feet north-west from the beacon-light; the tug being at that time, according to her captain, in the channel between the piers. From the first alarm until then the tug had proceeded only from 800 to 1,200 feet, having struck the current, and making slow progress. Upon the third alarm, the propeller's engine was stopped, her wheel put hard a-port, and the ship, turned out, made a circle in the lake, and was then headed due east, and entered the harbor hugging the south pier, proceeding at the rate of four miles an hour; just sufficient, as claimed by her master, to keep her under control. The north pier is about 1,600 feet long, the south pier projects into Lake Michigan 200 feet more. The distance between the piers at the mouth is 220 feet; at the east end, 190 feet. The beacon-light is located on the south pier, 200 feet east of its outer end, and directly opposite the outer end of the north pier. The life-saving station is on the north pier, 800 feet from its outer end. While proceeding between the piers, and, according to certain of the witnesses, at the beacon-light, and according to others of the witnesses opposite to or near the life-saving station, the propeller came in collision with the raft, separating some of the timbers of the boom, thereby permitting a portion of the logs to escape into the lake, where they were lost. The libel is filed to recover the value of the logs so lost.

The inquiry first presented for consideration is as to the duty of the tug and the raft with respect to lights, and whether that duty was performed. I am satisfied, so far as concerns the tug, that she was properly lighted, unless, under the circumstances of the case, ordinary prudence required the exhibition of some light that would prove an effectual warning to the coming steamer. The tug carried the regulation colored lights forward, and two vertical white lights, indicating to vessels approaching from ahead or upon the beam that she had a tow. It would seem to have been improper in such case to exhibit the central range of two white lights provided by rule 7. *The U. S. Grant and The Tally Ho*, 7 Ben. 195, 201. It is insisted by the claimant that the raft should have been dif-

ferently lighted. Under rule 12, water-craft and rafts navigating any bay, harbor, or river, by hand-power, horse-power, sail, or by the current of the river, or which shall be moored in or near the channel or fairway of any bay, harbor, or river, are required to carry one or more good white lights, which shall be placed in such manner as shall be prescribed by the board of supervising inspectors of steam-vessels. Claiming under this authority, the inspectors have divided the rule prescribing the lights to be carried by certain water-craft navigated or moored as specified in rule 12, and apparently providing, as to rafts, in whatever manner navigated, that a raft of one and not more than two cribs in length shall carry one bright light on a pole not less than six feet high; of three or more cribs in length, shall carry one white light at each end of the raft of the same height; that rafts of more than one crib abreast (a crib being thirty-two feet in width) shall carry one white light on each outside corner of the raft, making four lights in all. Syn. Dec. Treas. Dept. 1883, p. 89. Such provision is manifestly wise; notice being thereby given to a vessel approaching from any direction of the extent and boundaries of the raft. Such or similar provisions should be made obligatory by the congress with respect to rafts in tow, as well as to rafts navigated as specified in the rule. But I am not prepared to concede the power of the board of supervising inspectors of steam-vessels to enlarge the obligations imposed by rule 12, or to enact regulations with respect to lights upon rafts not navigated as designated in the rule. The power granted is limited to the regulation of the number and location of lights upon rafts navigated or moored as specified. It is not altogether clear that the inspectors designed to extend the regulation beyond the scope of the power conferred, but the regulation as to rafts is separated from the regulation of water-craft, and is in terms unlimited. The regulation must be restricted in its application within the limits of the power granted. I therefore hold that there is no regulation of the congress prescribing the character and number of lights to be exhibited at night upon rafts in tow.

What other duty then devolved upon the tug and raft with respect to lights under the circumstances? Articles 23 and 24 of the act adopting the revised regulations (23 U. S. St. at Large, c. 354, p. 442) provide that with respect to the regulations due regard shall be had to all dangers of navigation, and to any special circumstances which may render a departure from the rules necessary to avoid immediate danger; and that nothing in the rules contained shall exonerate any vessel from any neglect to carry lights or signals, or of the neglect of any precaution required by the ordinary practice of seamen, or by the special circumstances of the case. This tug had in tow a raft some 600 feet in length, and at the widest part some 220 feet in width. The tow was distant from the tug some 600 feet while in the lake, and some 300 feet as she entered the piers. No lights of the tug were visible to a vessel approaching astern. I do not regard the light through the window of the engine-room as useful in any sense as a warning. If there was such light, it was necessarily low and dim, its effective power depending in large degree upon the situation of the lantern in the engine-room, and the condition of cleanliness of the

window and the lantern. The lantern was there for use in, and to light, the engine-room; not for purposes of warning. ·It would not cast its rays far aft, and was not seen at any time from the decks of the propeller. This tow was a wide raft of logs, partially submerged, 10 times as wide as the tug, and, floating upon the waters, was not visible at any distance in that dark and rainy night. The only light was the lantern in the yawl-boat at the stern, which, by an approaching steamer, might well be taken, at the snail pace the tow was proceeding, for a vessel at anchor. The tug was approaching the harbor at Ludington, the seat of an active commerce, and at an hour when her master knew the propeller was due. ` She was entering the channel with a raft of equal width of the channel, and which would necessarily obstruct the passage of any vessel entering or leaving the harbor. The master of the tug knew of the propeller's approach when the latter was at least a mile distant, and no other lights than those mentioned were exhibited. The rules of navigation provide in certain cases for lights that will show all around the horizon, (rule 7;) that vessels at anchor shall exhibit at night, at a height not exceeding 20 feet above the hull, a white light in a globular lantern, so constructed as to show a clear, uniform, and unbroken light, visible all around the horizon, and at a distance of at least one mile, (rule 10;) and that every sail-vessel, on the approach of any steam-vessel, during the night-time, shall exhibit a lighted torch upon the point or quarter to which such steam-vessel shall be approaching, (Rev. St. § 4234.) These provisions indicate the care deemed necessary to give warning to approaching steamers. They declare and regulate, with respect to navigation, the exercise of that ordinary care for the protection of others which devolves upon every one at sea or upon land. While not obligatory with respect to rafts, they point the way to what acts should be deemed acts of ordinary caution. If, as the rule declares, prudence demands, in the case of a sailing vessel under way, that a torch should be exhibited by way of warning to a pursuing steamer, how much more is ·such or a similar effectual warning required in the case of a raft. A vessel is to some extent itself a signal of danger. She can be seen in ordinary weather at quite a distance. But a raft of logs floating upon the water at night gives no warning of itself, and is dangerous to navigation. Ordinary care requires that such lights should have been exhibited upon the raft as would indicate danger to a vessel approaching from any direction, and give suitable and timely warning. Failing such methods, it was incumbent upon the tug to exhibit such rear lights as would indicate to the approaching steamer her position, and give warning of her tow. Such or similar precautions in such a locality, and under the circumstances described, were, in my judgment, imperiously demanded by prudence, and their omission was negligence. *The Peshtigo*, 25 Fed. Rep. 488, 490. I am herein fortified by several expert seamen, whose testimony has been produced, and stands uncontradicted and unopposed, declaring the custom upon the Great Lakes to have for years been to have rafts in tow at night so lighted that their shape and dimensions would be exhibited to approaching vessels, and that the tugs of

such tows have been accustomed to exhibit at the stern a bright light indicating their presence to a pursuing vessel. The custom but conforms to the dictates of prudence, and emphasizes the duty which the law, in my judgment, imposes. I reach the conclusion, therefore, that the tug and raft were at fault, and that that fault was the primary and producing cause of the collision.

This finding is not, however, conclusive of the right of the libelant. The disregard of duty by the tug and raft did not warrant the propeller to neglect any reasonable precaution to avoid a collision; and if, notwithstanding non-compliance with duty by the tug and raft, the propeller might have avoided the collision by ordinary skill and seamanship, then both vessels were in fault, and the damage must be equally apportioned. *The Continental*, 14 Wall. 345. The record discloses, as to the location and acts of the vessels at and preceding the collision, the usual bewildering conflict in the evidence. Much of it is mere guess-work, self-contradictory, and unreliable. Some of it is evidently the offspring of imagination, stimulated by the excitement of the event. It would serve no useful purpose, however, to analyze this evidence. It is sufficient to state the conclusions to which my mind is impelled by a careful scrutiny of the testimony. If the master of the propeller miscarried in judgment in locating the signal, that was not of itself a fault, (*The Lepanto*, 21 Fed. Rep. 651;) and having, upon nearing the piers, reduced his speed to four miles an hour, so that the steamer could be stopped when the danger became apparent, he was not so far at fault. *The Scotia*, 14 Wall. 181; *The Sarmatian*, 2 Fed. Rep. 911. The danger signal was a warning that a vessel was ahead. No lights being observable, the propeller was bound to assume that the vessel was not approaching. She was, therefore, as to the tug, the overtaking vessel, and bound at her peril to keep out of the way. The warning, however, did not require the propeller to stop; there being more than sufficient sea-room in the channel to pass. It was only required that she should proceed slowly, and with caution, sounding proper signals. In fact, there was no collision with the tug. The signal was not, however, notice to the propeller that the tug had a tow that was to be avoided. The obligation to avoid collision with the tow did not become operative until notice that there was a tow to be avoided. (*The Leland*, 19 Fed. Rep. 771.) In entering the channel the tug made her course to the south pier, thence towards the north pier, so as to swing her tow into the channel, and avoid contact with the end of the north pier. The collision occurred at or very near the beacon-light on the south pier; the propeller striking the boom at or forward of its center. This must have been so, for the captain of the tug states that when the propeller was coming in after making her circle the tug was 500 feet from the end of the south pier. The tug was 90 feet in length, the hawser 300 feet, and the raft 600 feet. This would leave the entire raft outside of the north pier. When the propeller entered the channel the tug was 600 feet ahead of her. The stern of the tow was then necessarily astern of the propeller. The yawl-boat was at that time outside the pier, and the light was nearly 200 feet to the north-west of

the propeller. Upon the collision the propeller immediately reversed her engine, and began to back, which threw her stern over to port, and further into the raft. It is manifest she did not strike the tow astern, for in that event the steamer would not have encountered the raft with her propeller as she backed, and would have met serious difficulty, and probable disaster, in forcing her way through a compact body of logs filling the entire width of the channel, whereas she proceeded after the collision without difficulty. I find no act of negligence in the conduct of the propeller at the immediate moment of collision.

Was the propeller in fault in attempting to enter the channel at the time and under the circumstances disclosed? Three alarm signals had been sounded, which the captain of the propeller was unable to locate. He states these alarms to have been sounded before he put his wheel hard a-port, and turned out into the lake. There is great contradiction in the evidence of the location of the vessels at the times of these different signals, but I shall assume the fact to be as stated by the captain of the propeller. His object in turning into the lake was cautionary, and to locate the danger signal. The first alarm appeared to him to come from the little lake inside the piers in the vicinity of the railroad dock and ferry. The second alarm sounded nearer to him, ahead of him; but he could not say whether in the channel or not. At the third alarm the propeller was 1,000 feet away from the beacon-light. It sounded close, and from 600 to 1,000 feet away, a little on her port bow. The propeller being only 800 feet from the north pier, and the signal sounding not over 1,000 feet away, the captain, in the exercise of ordinary caution, was bound to assume that the alarm proceeded from a vessel at or near the mouth of the channel. Since he could discern no lights then, or after he had turned in the lake and headed for the channel, he was bound to assume that the vessel was not approaching him, but was ahead of him, passing up the channel. He was therefore, as to the tug, imposed with the responsibility of an overtaking vessel. All this, however, disconnected with other circumstances, was no notice of the tow, and, there being ample sea-room to pass, there was no fault in proceeding at cautious speed, if the propeller is not otherwise chargeable with notice of the tow. The captain of the propeller heard the tug exhausting, but, he claims, not before the collision. He asserts that he sounded one whistle to indicate to the tug that he would pass to starboard, but that this was done after the collision. The mate of the propeller, however, asserts that this signal was given just as the propeller started ahead after coming around, before the beacon-light was reached. In this he is corroborated by the evidence for the libelant. It was a proper signal to have been given before entering the channel, the exact location of the tug being unascertained. The mate also states that he could see no lights ahead, but that he heard the tug's exhaust, and therefrom knew that a tug with a tow was somewhere in the channel. He knew this before the beacon-light was reached. He knew it before the propeller entered the channel. He knew it when the propeller headed to enter the channel, and was nearly 1,000 feet away from the beacon-light. The propeller, then, had

timely warning of danger. That warning is located by her captain as just within the channel piers. When the propeller rounded to and headed into the channel, no lights could be seen, so that he ought to have presumed that the danger was not approaching. The known absence of lights imposed upon him the greater caution. The exhaust of the tug, indicating a tow, was heard by the mate as the propeller started ahead after coming around. The captain, in the exercise of diligent caution, should have heard that exhaust, if he did not. Notice to the mate was, however, notice to the vessel. If he failed to communicate the fact to his superior officer, he violated his duty; but the propeller is none the less responsible. Knowing, then, or chargeable with knowledge, that a tug with a tow was ahead; that no lights were exhibited indicating the character or dimensions of the tow,—the propeller was placed in the situation, as to the tow, of an overtaking vessel, and bound to keep out of the way. Rule 22; *The Charles Morgan*, 6 Fed. Rep. 913; *Whitridge* v. *Dill*, 23 How. 448, 454. I think that, under the circumstances, diligent caution required the propeller to stop. The captain had reasonable cause to apprehend danger. He knew that it was near. Notwithstanding the neglect of lights by the tug and tow, the propeller had no right to proceed, apprehending a near danger. I have not overlooked the evidence of expert seamen testifying for the claimant. I should lay great stress upon their opinions if founded on the whole evidence; but in the case propounded to them, the fact of the exhaust of the tug being heard on the propeller when headed for the channel, and indicating an unlighted tow near at hand, was not a stated factor in the problem submitted for their judgment. I cannot think they would approve the entering of the harbor, upon such a night, with a known but unseen danger just ahead. The propeller should have been stopped until the channel was known to be clear. A steamer moving in narrow waters, especially on a dark and rainy night, should exercise great caution and vigilance. She proceeds at her peril in the face of a known danger. Both vessels being in fault, the damages must be divided.