## THE SANTA ROSA.

(District Court, N. D. California, S. D.    February 20, 1918.)

### No. 15289.

1. SHIPPING ⊚⟿203—LIMITATION OF LIABILITY—STATUTES—CONSTRUCTION.

While the Harter Act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [Comp. St. 1916, §§ 8029–8035]) and other laws providing for limitation of liability of shipowners should be construed so as to effect their purpose of promoting shipbuilding, they should not be so liberally construed as to deprive passengers and cargo owners of that degree of care on the part of those owning ships which safety demands.

2. SHIPPING ⊚⟿209(3)—LIMITATION OF LIABILITY—BURDEN OF PROOF.

Under statutes providing that the liability of the owner of a vessel for any act, matter, or thing, loss, damage, or forfeiture, occasioned or received without the privity or knowledge of such owner, shall not exceed the value of owner's interest in the vessel, and her freight then pending, a shipowner has the burden of establishing that the loss for which a limitation of liability is sought occurred without its privity or knowledge.

3. SHIPPING ⊚⟿208—LIMITATION OF LIABILITY—RIGHT THERETO.

Early on a foggy morning a vessel, on a course set to pass not more than 1½ miles outside of a point over 100 miles away, struck on a rock or sand bar inside the point as a result of currents setting in shore. There was no storm. After the ship company was notified by wireless of the accident, and that it was advisable to transfer passengers to a steamer standing by, the company forbade the master to transfer passengers until arrangements were made for payment, or to accept the assistance of such vessels, save under fixed conditions as to payment. In the afternoon the vessel broke up as the result of heavy seas, and passengers were injured while being sent ashore. *Held* that, as it undertook to control the master after the vessel struck, and failed to show that the speed and course of the vessel near a dangerous point was not the ordinary course and speed of vessels of its fleet on that run, the company is not entitled to a limitation of liability on the theory that the loss occurred without its privity or knowledge.

In Admiralty. In the matter of the petition of the Pacific Coast Steamship Company, a corporation, owner of the steamship Santa Rosa, for limitation of liability. Limitation of liability denied.

Geo. W. Towle, Edwin T. Cooper, Ira A. Campbell, and McCutcheon, Olney & Willard, all of San Francisco, Cal., for petitioner.

William Denman, Harold Ide Cruzan, and Denman & Arnold, all of San Francisco, Cal., for certain claimants.

DOOLING, District Judge. This case was tried long since. An unusual delay in filing briefs and thereafter my own enforced absence

⊚⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

from court have delayed a decision up to the present time. Even now the press of other matters does not allow me the time to review the cause with such care and to such extent as its nature and importance demand.

The proceeding is one brought by Pacific Coast Steamship Company for limitation of any liability arising out of the wreck of the steamer Santa Rosa which occurred in July, 1911 The vessel left San Francisco with 300 souls on board on July 6, 1911, and about 3 o'clock in the following morning struck on a rock or sand bar 1½ miles inside Point Arguello, and at least 3 miles east of where she should have been. There was no storm, there was nothing wrong with the vessel's motive power, there appears no reason why she could not have safely steamed her course, except that in a fog she hugged the shore, instead of proceeding, as she could have proceeded with perfect safety, upon a course further out to sea It is one more of those unfortunate accidents, far too common on this coast, and perhaps elsewhere, due to the desire of the steamship companies, and perhaps to the passengers, to get there quickly. Experience does not seem to have taught the lesson that it is better to arrive a little late than not to arrive at all.

The fault in this particular case was that in a fog when off Point Sur, where the vessel's exact position could not be determined by a view of anything on shore, a course was set for Point Arguello, over 117 miles away which, if not interfered with by currents known to exist, would pass that point at a distance of from but 1 mile to 1½ miles. Unfortunately the currents setting inshore did take the vessel off her course, so that, instead of passing Point Arguello a mile or a mile and a half to the westward, she struck shore inside the point by about the same distance.

[1-3] The law is generous with shipowners in that it provides (Harter Act) that if the owner of any vessel transporting merchandise or property to or from any port in the United States shall exercise due diligence to make the vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner, agent, nor charterer shall become or be held responsible for damage or loss resulting from faults or errors of navigation or in the management of the vessel. This applies to questions arising between the vessel and shippers of cargo on board of her The law further provides (limitation of liability) that the liability of the owner of a vessel for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or received without the privity or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in the vessel and her freight then pending. These statutes are, of course, to be enforced in such spirit and with such liberality as will effect their purpose—the encouragement of shipbuilding and the employment of ships in commerce. But such liberality of enforcement should not be carried to an extent that will deprive cargo owners and passengers of that degree of care on the part of those owning and operating ships which their safety demands and to which they are entitled.

It is urged by claimants in the present case that it was grossly negligent on the part of the master of the vessel to set his course for a run of 117 miles on such line as would miss Point Arguello under the most favorable circumstances by not more than 1½ miles, and to run on this course towards a fog-bound point at the full speed of 14 knots, where, as was well known, there is frequently a current setting on shore which may take a vessel off her course by several miles, and that the owners must have been privy to such negligence, because the logs of their vessel on this run in previous trips would show that this was the customary route and speed in rounding this point. For this asserted negligence the court is asked to award exemplary damages to claimants During the trial the production of these logs was demanded by claimants, and petitioner promised to produce them. This was not done, so that it may at least be assumed that their production would not have helped petitioner's case.

I am not a navigator, but it does not seem to me that it is necessary to be such in order to know that danger lies in proximity to the coast in a fog; and the number of vessels that go ashore in the fog on this coast, with nothing the matter with their motive power, and while under full control, affords grave reasons for inquiring whether the risks undertaken by their masters in thus hugging the shore are not undertaken with the knowledge and consent, if not under the express orders, of their owners, either for the purpose of shortening the time of the voyage, or for some other purpose not disclosed or apparent The safety of the thousands of persons who travel by sea up and down the coast requires that the court should not listen with over-eager ears to the excuses offered for the loss of vessels which should never have occurred, or to the general disclaimer of responsibility for wrecks that could have so easily been avoided.

In these proceedings the burden of proof is upon the petitioner to show that the loss occurred without its privity or knowledge. It did not show, nor did it attempt to show, that the course and speed of the Santa Rosa at the time she went ashore were not the usual course and speed of the vessels of their fleet upon this run, alike in foggy and in clear weather Indeed, the failure to produce the logs requested and promised would indicate that they were. If this be so, and if it were negligence on the part of the master to lay a course of that length with currents setting on shore, and leaving such a slight margin of safety as a mile or a mile and a half in that long course, and to run that course as he did in the fog, then such negligence was with the privity and knowledge of petitioner, if it had knowledge that such was the usual course and speed in a fog I cannot find that this was without petitioner's privity or knowledge. So much for what occurred before the vessel went ashore.

She struck at about 3 o'clock a. m., and early in the morning sent word by wireless to petitioner's San Francisco office. After consultation with the insurance agent and others, the only person connected with this office who could be found at that hour sent word to the master of the vessel, advising him as to what he should do, and continually during the day messages were passing between the vessel and the office on shore. All this time the vessel was hanging on the rock or

sand bar with all the passengers on board. For a great portion of the day the sea was sufficiently smooth to allow the transfer of the passengers to other vessels then in attendance, though the breakers on the shore would not permit their landing in small boats.

It would serve no purpose to introduce here all the telegrams that indicated to what extent the office on shore undertook to control the action of the master, in the emergency in which he and his vessel were placed. They advised him to put out a kedge anchor; they advised him that they wished to avoid any unnecessary salvage claim, and that they did not consider that two steam schooners, the Centralia and the Drew, that were standing by, could be of any assistance, and if he had not engaged them at not less than $200 per day they wished him to release them, and, if unable to force them to withdraw otherwise, to cut their lines and not to allow them to refasten. They told him the important thing was to get his anchors in such position that he could put a strain on them with the windlass, and that this was worth a dozen steam schooners' towing. They told him they had arranged with the steamer Argyle to render assistance, but coupled this information with suggestions as to how such assistance should be rendered.

All of this advice, instruction, and suggestion may have been sound; but they were not at the scene of the disaster, as the master was, and their recommendation, advice, instruction, suggestion, or whatever it may be called, did not tend to leave to him that free exercise of his own judgment in the emergency to which, if he were competent, those on board were entitled. So much for the attempted control by the office of the maneuvers relating to the vessel itself. As to the passengers the record discloses that the office, having received information that the vessel was swinging back and forth as though lodged on a rock under her center, and that there was too much surf to permit the landing of the passengers on shore, sent to the master the following message:

"If you transfer passengers by steamer, make arrangements for payment of a lump sum or so much per passenger."

The master sent word:

"Argyle hawser carried away. All working to get her off at high tide 9 p. m. So far hull and machinery O. K. Advisable to get passengers off as soon as possible. Would like to transfer passengers to Centralia to Port Hartford."

To this the office replied:

"Transfer passengers to Port Hartford by Centralia, but agree on the price before doing so."

The master replied:

"Centralia refuses to make any arrangement for towage and passengers. Centralia and Drew want all arrangements settled in S. F."

And later:

"Centralia will take passengers, but will not make any price. Matter must be settled in San Francisco."

And finally, after the sea had roughened and it was too late, the office sent the master the following message:

"Give due consideration to passengers without regard to expense."

It is the opinion of the court that this message last sent, and in the evening when it was too late, is the one which should have been first sent on the morning of that eventful day.. In the meanwhile, and while the messages were passing between the office and the master, ineffectual efforts were being made to pull the vessel off. It is evident that the master wanted to transfer the passengers to the Centralia, but was restrained from so doing at the time when it could be done by the directions from the office to arrange the terms and his inability to do so. It is true that he testified that he had not been in any way influenced by the messages from the shore; but his actions and his messages contradict this statement, and the testimony of the passengers establishes the contrary. To one the master declared:

"You see that steamer lying out there. We are just planning making arrangements to get you off on that steamer, and we are only waiting to settle terms. They know we are in a hard fix, and they want to hold us up."

To another, who asked him, "Why don't you put us off?" he said "he was waiting for orders as to what to do with us." To another he stated "he could not put us ashore; he was working under orders of his company and it was impossible; that he had a wireless, and was working, under orders." To another he said, "I can't do nothing until I hear from the steamship company."

The master was therefore prevented by the office from exercising his own judgment, the result being that the passengers were left on board until, the heavy seas broke the vessel apart in the afternoon, and then they had to be sent ashore in nets, swinging on a line from the vessel to the shore, and buffeted by the breakers. Many of the claims here are for injuries and suffering thus occasioned. Others are for loss of baggage, and some for loss of life. The latter loss, however, occurred, not when the passengers were sent ashore, but when a boat capsized during the day.

There is sufficient preliminary evidence to show that there is some liability on the part of petitioner, and the matters hereinbefore set out, in my judgment, preclude it from the right to have such liability limited in this proceeding. The claimants may either pursue their remedies here or in the state courts, as they may be advised. If they elect to remain here, their claims will be referred to the commissioner. If they do not so elect, any order restraining them from proceeding will be vacated.

A decree will be entered accordingly.