THE JAMES GRIFFITHS.*

SPERRY FLOUR CO. v. COASTWISE
STEAMSHIP & BARGE CO.,
Inc., et al.

No. 7751.

Circuit Court of Appeals, Ninth Circuit.
June 29, 1936.

Lloyd M. Tweedt and Derby, Sharp, Quinby & Tweedt, all of San Francisco, Cal., and Howard G. Cosgrove and Cosgrove & Terhune, all of Seattle, Wash., for appellant.

Lawrence Bogle, Edward G. Dobrin, and Bogle, Bogle & Gates, all of Seattle, Wash., for appellee.

Before WILBUR, DENMAN, and HANEY, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a decree in admiralty deciding adversely to the claim of appellant for damage to and nondelivery of a shipment of flour occasioned by the stranding of the carrying steamer James Griffiths, through the admitted gross negligence of her Chief Mate, Mortensen. In complete absence of volition, he ran the vessel ashore under a warning light he had seen and approached for several miles, the night being clear and many miles of open water to his port.

The disposition of one of the issues raised in the appeal disposes of the entire case. The bill of lading incorporated the Harter Act, 46 U.S.C.A. §§ 190–195, and that issue is whether the Chief Mate, who was employed by the Master of the vessel

*Rehearing denied Sept. 21, 1936.

shortly before her sailing on the day before the stranding, was incompetent when she sailed and hence the ship unseaworthy, and, if so, whether due diligence had been exercised to determine his competence prior to her sailing.

In considering this issue the court, in a trial de novo, considers the whole evidence pertinent to the issue, with a presumption that the findings of the District Court are correct. The Ariadne, 13 Wall. 475, 479, 20 L.Ed. 542; Munson S. S. Line v. Miramar S. S. Co. (C.C.A.) 167 F. 960; Brooklyn Eastern Dist. Term. v. U. S., 287 U.S. 170, 176, 53 S.Ct. 103, 77 L.Ed. 240; Broughton & Wiggins Nav. Co. v. Hammond Lbr. Co., 84 F.(2d) 496, decided by this court on June 10, 1936. In this case the presumption has its fullest strength, for all of the pertinent evidence was heard viva voce by the district judge. Broughton & Wiggins Nav. Co. v. Hammond Lbr. Co., supra.

The duty of the owner, here performed through the Master, to exercise due diligence in making the vessel seaworthy as to her personnel, particularly, as here, her Chief Mate, is one of the owner's highest obligations. The safety of the men and of the cargo in the midst of the perils of the sea must rest at critical moments upon his competence. Necessarily, in view of the present organization of the shipping industry, with constant shifts of personnel, the owner must rely upon inquiry of informed sources concerning the qualifications of newly employed officers.

The evidence here shows that while in the port of Tacoma the then Chief Mate of the James Griffiths was compelled to leave the ship on account of the death of his mother; another Chief Mate was engaged and he was unable to serve because of the illness of his wife. The vessel was about ready to sail and the Captain made a third attempt. He delegated to the Sea Service Bureau of the United States Shipping Board, created by the Department of Commerce, the exercise, in part, of the diligent inquiry as to the qualifications of the desired Chief Officer.

The functioning of the Sea Service Bureau is well known. It was created primarily for the purpose of supplying officers and crews to vessels belonging to the United States Shipping Board; branches of the Bureau were created in various cities on both coasts, on Puget Sound in Tacoma and Seattle, and their knowledge and facilities were made available to shipping concerns privately owned. The choice of such an agency does not show a lack of diligence and it was a proper agency to which could be delegated the obligation of diligence, though, of course, the delegation of diligence to an agent would impose upon the shipowner liability arising from any lack of diligence in the exercise of the agency.

The Chief Mate, Mortensen, had been employed through the Bureau on a number of occasions, once as Second Mate and twice as Third Mate. Inquiry had been made by the Bureau's officials as to his competency and upon our consideration of the evidence we hold that the Bureau, acting on behalf of the owner of the Griffiths, exercised due diligence in determining that he was qualified to fill the position of her Chief Mate, to the extent that diligent inquiry into his past experience and competence was required.

The question remaining is whether Mortensen had become incompetent subsequent to the time the diligence of the Bureau had determined his then competence and, further, if he had become incompetent in the interim, whether due diligence had been exercised and as a result of such diligence it was proper to conclude that he appeared competent.

Mortensen came aboard ship in Tacoma some time between 12 and 1 o'clock noon on Monday, March 2, 1931. The vessel left Tacoma late in the afternoon. The first watch of the Chief Mate was from the succeeding midnight until 4 o'clock Tuesday morning. Within an hour and forty minutes after going on watch he navigated the vessel on to Rosedale Reef off Race Rock light off Vancouver Island. Although the night was clear and he had many miles of open water to his port, he drove the vessel straight on to the light ahead, apparently having suffered complete loss of his faculties and volition. The evidence shows that he had during the day and evening preceding taken inordinate doses of aspirin to cure or alleviate a cold with which he had suffered for several days. In view of the medical testimony and that of Mortensen himself, we find that the cause of the wreck was the mental condition produced by the overdoses of aspirin.

Undoubtedly Mortensen was incompetent at 1:36 o'clock Tuesday morning at

the time of the stranding. The testimony does not show whether sufficient aspirin had been taken at the time the vessel sailed from Tacoma to make him incompetent and hence the vessel unseaworthy as to her Chief Officer when she sailed. It is, however, unnecessary that this question be determined, in view of our disposition of the question whether the Captain had exercised due diligence in ascertaining his competence between Mortensen's arrival on Monday afternoon and the time the vessel sailed. There is no testimony to the effect that there was any sign of the cold, much less of the aspirin treatment to which Mortensen was subjecting himself in the period after he came on board and prior to sailing.

On the contrary, the testimony is that he appeared to be a strong and healthy man, and that prior to sailing he was engaged in work about the vessel requiring physical endeavor. There was nothing to arouse a suspicion in the Captain's mind that between Mortensen's arrival on board and the succeeding midnight he would overdose himself with the aspirin which, the testimony shows, Mortensen did not realize would cause the mental condition leading to the stranding.

■■ While the burden of proof is upon the shipowner to show a diligent inquiry concerning the competency of the Chief Officer, where the question, as here, is one of a temporary physical and mental disablement, we cannot hold that after his sight has told him that the man was strong and healthy, the Captain is put upon inquiry as to whether the Chief Officer was about to use or was using medical treatment which might lead to such unexpected results as here occurred. We therefore find that due diligence was exercised by the owner of the James Griffiths in the employment of Mortensen as Chief Mate.

The evidence affirmatively shows that in all other respects due diligence had been exercised in making the vessel seaworthy for the voyage in question. We hold that the damage to the cargo of the Sperry Flour Company was caused by the negligence of Mortensen, the officer navigating the vessel; that the owner in no way participated in this negligence in navigation, and that it is entitled to no relief against the vessel and her owner.

Affirmed.