## THE SILVER PALM.

### SILVER LINE, Limited, v. UNITED STATES et al.
No. 8152.

Circuit Court of Appeals, Ninth Circuit.
Oct. 28, 1937.

Lillick, Olson, Levy & Geary, Ira S. Lillick, Joseph J. Geary, and Gilbert O. Wheat, all of San Francisco, Cal., for appellant.

H. H. McPike, U. S. Atty., and Robert L. McWilliams and Esther B. Phillips, Asst. U. S. Attys., all of San Francisco, Cal., for appellees.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges

DENMAN, Circuit Judge.

This is an appeal by the Silver Line, Limited, a British corporation, describing itself as both "owner and operator" of the British motorship Silver Palm, from a decree denying its petition for exoneration from and limitation of liability for damages following a collision between the Silver Palm and the United States cruiser Chicago. The collision occurred in a three-vessel maneuver in the fog off the California coast and in the steam and sailing trafficway between the Port of San Francisco and the Port of San Pedro.

The Silver Palm, under the command of a Captain Cox, exceeded moderate speed. The excess causatively contributed to the collision, and she was held liable. The United States, owner of the Chicago, and other injured persons filed claims and contested the petition.

Exoneration having been denied, the remaining issue is whether the Silver Line may limit its liability. The statute creating this right (46 U.S.C.A. § 183) provides such relief only when the negligence causing the collision occurs without privity or knowledge on the part of the owner. The burden of proof of such absence of privity and knowledge is on the petitioning owner. McGill v. Michigan S. S. Co. (C.C.A.9) 144 F. 788, certiorari denied 203 U.S. 593, 27 S.Ct. 782, 51 L.Ed. 332; The Annie (D. C.) 261 F. 797, 799, affirmed sub. nom. People's Nav. Co. v. Toxey (C.C.A.4) 269 F.

793; Henson v. Fidelity & Columbia Trust Co. (C.C.A.6) 68 F.(2d) 144, 145; Petition of Diamond Coal & Coke Co. (D.C.) 297 F. 242, affirmed (C.C.A.3) 297 F. 246, and certiorari denied Diamond Coal & Coke Co. v. Hazelwood Dock Co., 265 U.S. 595, 44 S.Ct. 638, 68 L.Ed. 1197; In re Reichert Towing Line (C.C.A.2) 251 F. 214, 217, certiorari denied Reichert Towing Line v. Home Ins. Co., 248 U.S. 565, 39 S.Ct. 9, 63 L.Ed. 424; In re P. Sanford Ross (C.C.A.2) 204 F. 248, 257; The 84-H (C.C.A.2) 296 F. 427, 432, certiorari denied Randolph v. Bouker Co., 264 U.S. 596, 44 S.Ct. 454, 68 L.Ed. 867; Christopher v. Grueby (C.C.A.1) 40 F.(2d) 8.

We are aware that, without citing or referring to any of these cases, the Supreme Court of the United States in Spencer Kellogg v. Hicks, 285 U.S. 502, 514, 52 S.Ct. 450, 454, 76 L.Ed. 903, in an opinion joined in by but five of the justices, has stated: "Under the federal statutes the company, acting in the first capacity, was entitled to a limitation of liability *unless the claimants could prove negligence with the owner's privity or knowledge.* They assumed the burden of proving *such* negligence." (Italics supplied.)

In view of the fact that the Spencer Kellogg Case came to the Supreme Court with privity and knowledge on the part of the shipowner affirmatively established, the suggestion that the statute gives to the shipowner the right to the limitation if he proves nothing at all concerning his privity or knowledge and *"unless the claimants could prove* negligence *with* the owner's privity or knowledge"* is no more than dictum. It will be noted that it inverts the language of the limitation act which states the owner's right in the negative; that is, as existing only as to injuries "with*out* the privity or knowledge of such owner." We consider the dictum an inadvertence and not intended to suggest an overruling of the unanimous holdings of the six circuits cited above.

The Silver Palm and 18 other vessels of the petitioner combined with vessels of two other lines in a series of around-the-world voyages, taking and delivering merchandise at various ports at scheduled dates of arrival and departure. The schedules call for an average cruising speed of 13½ knots. There is evidence that they were difficult to maintain, and that the ships sometimes failed to arrive and depart in accordance with them.

It is obvious that the maintaining of such schedules was one of the strongly inducing persuasions to shippers to ship upon petitioner's vessels and other vessels on the scheduled around-the-world route. Human nature being what it is, it is equally obvious that there would be a strong urge upon the masters of the vessels so to run them through the various vicissitudes of ocean weather that the schedules would be maintained, and that a good record in maintaining them would be a recommendation to the employer and tend to work against the usual and customary instructions to all captains to obey the rules of navigation.

The United States contends that a comparison and analysis of the contemporaneous entries of the deck and engine room log book of the Silver Palm while under the command of Capt. Cox, and of other Silver Line vessels in the around-the-world scheduled voyages, shows that the Silver Line's masters frequently ran their vessels at excessive speeds in the fog. It contends that an organization so engaged in attempting to maintain its schedules should have its officers under adequate surveillance to determine whether or not they pursue a moderate speed in the fog and do not exceed it in attempts to maintain their port arrival and departure dates.

The United States claims that the testimony establishes there was no such inspection and no such discipline over the captains and that, had there been such discipline, the captain on the Silver Palm would not have been running at an excessive speed in the fog at the time of the collision. It therefore claims failure of the Silver Line in this regard to maintain its burden of proof of absence of privity and knowledge.

The method by which the government seeks to establish that the Silver Line vessels ran at excessive speeds in the fog is by a comparison of the speeds shown in the engine room logs with the weather conditions as shown by the deck logs. Each log in evidence is in one handwriting through all the watches; that is, it is the smooth log and not book or paper of original entry.

The speeds shown in the logs of these vessels are based upon the record of revolutions on the revolution counters in the engine rooms of the several ships. The government contends that, while such records of merchant ships are not kept with the "perfection" and accuracy of those on naval vessels, nevertheless they are sufficiently accurate to establish the conduct of the vessels in the fog by comparison of such entries of the deck and the engine room.

We have no doubt of the correctness of the government's contention that the entries of those watching the revolution counters afford a proper basis for determining the speed at which the engines are run. However, the Silver Line's smooth engine room logs are mere summarizations of the original entries in the engine room bell books or scratch logs showing the number of counter revolutions between an order changing speed or stopping or reversing and the succeeding order. Since we have merely the hourly summaries of the revolutions as shown on the counters, it is impossible to say that within the hour there may not have been many stops as a thickening fog required them. The smooth deck logs in their general statements of the watches that the regulations are complied with are not inconsistent with an occasional order for a change of speed in varying fog conditions. Such general statements may well be the summarization of slowing orders on the rough log or scratch tablet used on the bridge.

On this issue we cannot hold that there was actual knowledge on the part of the Silver Line or knowledge which it should have acquired of a habit or custom of running at excessive speed in the fog, and hence privity for failing to act on such knowledge, which would bring this case within such decisions as The Santa Rosa (D.C.) 249 F. 160, 162; The Vestris (D.C.) 60 F.(2d) 273, 280; The G. K. Wentworth (C.C.A.9) 67 F.(2d) 965.

The United States next asserts that the motors of the Silver Palm made her take a much longer time to reverse from full ahead; that the Silver Line knew this, and Capt. Cox did not; that Capt. Cox' ignorance led him to drive his vessel at a higher speed than he otherwise would, under the impression she had the stopping time and power usual to merchant ships; and that the owner's failure to advise him contributed to the collision. Hence the United States contends the Silver Line, instead of maintaining its burden to show absence of privity and knowledge, is affirmatively shown to have both.

The Silver Palm, of 6,385 gross tonnage, was driven by a Doxford-Diesel two-

cycle opposed piston motor. A feature of this comparatively recent improvement in Diesel propulsion is that, due to the principle of its operation and its high mechanical efficiency, no reversing power can be applied to the propeller shaft until the motor has come to a stop. After cutting off its fuel supply, the momentum of the undriven ship forces her ahead at gradually reducing speed, and drags the passing water through the propeller blades. The propeller is thus caused to continue to revolve until, in the diminishing speed of the ship, the friction of the shaft on its bearings and connecting parts of the motor causes it to stop. The Silver Palm had no braking device to hasten the stopping.

With this motor, the ship, when proceeding at a rate greater than five or six knots, had an effective stopping time materially longer than that of ships otherwise powered. The evidence shows that at a speed of 13 knots ahead an ordinary merchant vessel of the size of the Silver Palm can put her engines in reverse within one minute or less. The Silver Palm was proceeding at 13 knots just before the collision in question, and the testimony shows that, at that speed, 3 or more minutes must elapse following a stop order before the engine can be put in reverse.

The court below found that the master of the Silver Palm, Capt. Cox, did not know of the peculiarity of the Doxford engine at the time of the collision, though he had had command of the vessel for many months. Unless advised, it is entirely possible that a captain would not learn of this condition until he made the unusual emergency maneuver of reversing when going at a high speed ahead. With good luck, a vessel could well make several voyages around the world without requiring such action on his part.

This finding is amply supported both by depositions of the captain and by his testimony on the stand in this case. In some respects his testimony as to his knowledge or lack of knowledge of the Doxford's engine's reversing ability is conflicting. Since he was the only witness on the issue of his knowledge, it was peculiarly within the trial judge's province to determine it. In view of the Silver Palm's burden of proof to sustain its claim to limitation, and in view of the presumption of correctness attending a finding of the District Court who heard that sole witness testify, we accept the finding as correct.

There can be no doubt that this inherent quality of the propelling power of the motorship, combined with the captain's ignorance, was a proximate cause of the collision.

With the burden of proof on it, the petitioner offered various witnesses having to do with the ownership and operation of the Silver Palm to show absence of privity and knowledge in them of this condition of the motor and hence in the petitioner. None of these testified that he did not know that the vessel could not be reversed when proceeding at 13 knots speed without the previous execution of a stop engine order and a waiting until the speed of the vessel dropped sufficiently to allow the engine to stop. On the contrary, the evidence affirmatively shows that the petitioner did know of this characteristic of the engine; had discussed the application of a braking device which might diminish the time in reversing; and had rejected its installation. The evidence further shows that petitioner did not acquaint Capt. Cox with the reversing characteristics of the engine.

The likely operation of the desire on the part of the captain to reach and depart from his various ports in accordance with the scheduled plan of operation made the more imperative the obligation of the owner and operator to advise Capt. Cox of the fact that, if he were running the vessel in a fog at a speed in excess of 5 knots, his vessel, unlike those otherwise driven, would have a very long period between the stopping of his motors and effective reversing.

Petitioner relies on cases such as Sperry Flour Co. v. Coastwise S. S. Co. (C.C.A.9) 84 F.(2d) 785, 787, and Lord v. Goodall, etc., Steamship Co., Fed.Cas.No. 8,506, in which the captain or other officer of a vessel, unhampered by scheduled dates, having a reputation for competence, is sent to sea and intrusted with the operation of a vessel of ordinary and usual type of propulsion. In such conditions of employment it is clear that the owner has no privity in or knowledge of the occurrences at sea in the course of the voyage.

Here the evidence affirmatively establishes an entirely different situation in the failure to communicate to the captain the peculiarity of the ship's extraordinary long stopping period from the usual speed at sea under emergency conditions requiring the reversal, coupled with the normal induce-

ment to maintain fixed schedules at the ports on the continuous voyage around the world.

Petitioner also urges· that there are some 70 other motorships operating with Doxford engines having similar characteristics in the control of the vessel in emergency situations, and that such vessels have been highly classified in Lloyds. It produces a number of witnesses who state that these vessels can be operated without danger. It is obvious that they must be operated with a higher care in situations likely to create the need for a quick reversal, than those of the usual type of propulsion. This evidence proves no more than this, and does not meet the contention of the claimants that such a vessel is unsafe when operated by a master ignorant of its motor character.

Against its allegation that it was the "operator" of the vessel, the petitioner attempted to establish that it had delegated its operation to another corporation, Stanley and John Thompson, Limited. It claims that this other corporation and not the Silver Line was the real operator of the Silver Palm and that its knowledge and privity is not that of the petitioner. We have examined the evidence, under the contestable theory that, despite the pleading to the contrary, petitioner may force on the United States and other claimants a controversy in which petitioner seeks to evade the character in which it sought the extraordinary relief of limitation of its common-law or admiralty liability.

■ In proceedings for limitation the owner may not escape liability by giving the managerial functions to an employed person acting as its agent, whether the person be corporate or otherwise. So far as concerns privity and knowledge, such an agent is its alter ego. Craig v. Continental Ins. Co., 141 U.S. 638, 648, 12 S.Ct. 97, 35 L.Ed. 886; Eastern S. S. Corporation v. Great Lakes Dredge Co. (C.C.A.1) 256 F. 497, 502; Sperry Flour Co. v. Coastwise S. S. Co. (C.C.A.9) 84 F.(2d) 785, 786.

There was no charter of the vessel to the line in which the Silver Palm ran. The corporate manager, as agent of the owner, collected her freights, paid the expenses, employed and paid the ships' officers and crew.

The petitioner and Stanley and John Thompson, Limited, had the same London address. Stanley Thompson was the manager of both companies. His nephew, Cyril Thompson, was a director of both companies. The evidence shows the various members of the Thompson family to be mutually interested not only in the ship-owning and ship-managing companies, but also in the shipbuilding company which constructed the vessels of the Silver Line. The Thompson family even interlocked with the company building the Doxford-Diesel engine, for in that connection Stanley Thompson volunteers the testimony that he "married a Doxford." All four companies constitute a family affair, so far as concerns the issue here of privity and knowledge.

■ It is clear from the evidence that the operating company was the alter ego of the owner and that the allegation in the petition that the petitioner was the operator is supported by the evidence of an operation per agens, rather than contradicted, if that contradiction were available to the petitioner in the condition of the pleadings.

■ We therefore hold that the Silver Line was the operator of the Silver Palm at the time that the captain's ignorance of the extraordinary long period between full ahead and reverse proximately contributed to the collision with the Chicago. It has not maintained its burden of proof that it had no knowledge of and no privity in the cause of the damage for which it seeks to limit its liability.

■ The District Court properly denied the petition for limitation. However, instead of freeing the claimants to pursue their claims in separate actions, if they so desired, the court ordered a reference for the proof of damage to the claimants. They should be free to remain in the limitation proceeding or sue elsewhere. In re Liverpool, etc., Nav. Co. (Vestris) (C.C.A. 2) 57 F.(2d) 176, 179; The Salvore (C.C. A.2) 36 F.(2d) 712, 714. The injunction restraining separate litigation is dissolved as to the claimants appearing herein. The order of reference for further hearing on the claims is reversed and the District Court advised to await the further action on the part of the claimants. The decree denying the petition for limitation of liability is affirmed.