KULACK v. THE PEARL JACK et al.

KLARIC v. BARRON et al.

CIOHON v. THE PEARL JACK et al.
Nos. 1628½, 1629, 1628.

United States District Court
W. D. Michigan, S. D.
Sept. 2, 1948.

Irving D. Bloom and Bloom & Bloom, all of Chicago, Ill., and Clifford A. Mitts and Mitts & Smith, all of Grand Rapids, Mich., for libelants Kulack and Ciohon.

Leo W. Hoffman, of Allegan, Mich., for libelant Klaric.

Irving S. Toplon and Theodore E. Rein, both of Chicago, Ill., and John L. Wierengo and Varnum, Riddering, Wierengo & Christenson, all of Grand Rapids, Mich., for respondent Frank A. Denison.

Fred T. Miles, of Holland, Mich., and Frederick T. Miles, of Coopersville, Mich., for respondents John Barron, Sr., and John Barron, Jr.

STARR, District Judge.

In July, 1945, the Pearl Jack, a Chriscraft speed boat owned by respondent Frank A. Denison, was being operated upon the navigable waters of the Kalamazoo river and Lake Michigan as a duly licensed common carrier of passengers for hire. On July 30th of that year, at about 8:30 in the evening, this boat, then in charge of respondent John T. Barron, Jr., a licensed pilot, left the pavilion dock in the village of Saugatuck, with the three above-named libelants and others as passengers, for a pleasure ride on the river and lake. When the boat was a short distance from the dock, and when Barron, Jr., attempted to start the engine, or immediately after he started it, an explosion and fire occurred. The three libelants, who were sitting in the rear cockpit, were severely burned, requiring medical care and hospitalization.

On November 21, 1946, Bernice Pump Kulack and Marjorie K. Ciohon each filed a libel in admiralty, alleging that at the time of the accident the Pearl Jack was owned by respondents John T. Barron, Sr., and Frank A. Denison; that they were engaged in the operation of the boat as a joint venture; and that they had employed respondent John T. Barron, Jr., to operate it. They alleged that the respondents were negligent in failing to properly inspect the boat, in failing to have the motor compartment equipped with proper vents, in failing to inspect and keep the motor and starter in good repair, and in failing to discover the presence of gasoline fumes in

the motor compartment. Libelant Kulack claimed damages of $50,000 and libelant Ciohon damages of $10,000. Barron, Sr., answered, denying liability on the ground that he had no interest in the boat; that he was not operating it as a joint venture with respondent Denison; and that Barron, Jr., was not employed to operate it. Barron, Jr,. answered, alleging that the boat was owned by respondent Denison and that he and Denison were engaged in its operation as copartners. He denied the charges of negligence and also denied that his father, Barron, Sr., had any interest in the boat or was engaged in a joint venture with Denison. Denison answered, admitting that at the time of the accident he owned the boat. However, he denied liability to libelants and all charges of negligence on the part of himself and Barron, Jr. He alleged that the accident occurred without his privity or knowledge and claimed that under 46 U.S.C.A. § 183 et seq., his liability, if any, should be limited to the value of the boat after the accident.

On September 6, 1946, libelant Frances Klaric began a law action against respondents in the circuit court for Allegan county, Michigan, claiming damages of $15,000 and alleging that Barron, Sr., and Denison owned and operated the Pearl Jack as copartners. She also alleged negligence on the part of respondents in failing to properly inspect the boat, its motor, gasoline tanks, and equipment; that the port gasoline tank leaked; and that when the engine was started, accumulated gasoline fumes were ignited, causing an explosion and fire. The respondents answered, denying liability. An order was subsequently entered in circuit court removing the Klaric law action to this court.

On May 19, 1947, Denison filed petition in pursuance of 46 U.S.C.A. § 183 et seq., for limitation of his liability to the value of the Pearl Jack after the accident. In his petition Denison alleged that he was the sole owner of the boat; he denied the charges of negligence and alleged that the explosion and fire occurred without his privity or knowledge. He alleged that the value of the boat after the accident did not exceed $1,500 and that the claims against him and the other respondents exceeded this amount. He asked that a writ of monition issue against libelants Kulack, Ciohon, and Klaric citing them to appear and make proof of their respective claims. In pursuance of this petition a writ of monition was issued and was duly published and served upon each of the libelants, who answered, denying that Denison was entitled to have his liability limited.

As these three cases arose out of the same accident and involved the same issues, they were consolidated for hearing on Denison's petition for limitation of liability and for trial on the merits. The first question to be determined is whether or not respondent Denison's petition should be granted. 46 U.S.C.A. § 183, provides in part:

"(a) The liability of the owner of any vessel, whether American or foreign, * * * for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, *without the privity or knowledge* of such owner or owners, shall not * * * exceed the amount or value of the interest of such owner in such vessel, and her freight then pending. * * *

"(e) In respect of loss of life or bodily injury the privity or knowledge of the master of a seagoing vessel or of the superintendent or managing agent of the owner thereof, at or prior to the commencement of each voyage, shall be deemed conclusively the privity or knowledge of the owner of such vessel."

The Pearl Jack was a "vessel" within the meaning of that term as used in the above statute. 46 U.S.C.A. § 188; Grays Landing Ferry Co. v. Stone, 3 Cir., 46 F.2d 394; The Linseed King, D.C., 24 F.2d 967, 975; The Trim Too, D.C., 39 F. Supp. 271; Petition of Liebler, D.C., 19 F. Supp. 829.

Respondent Denison, who was experienced in the operation of motor boats, bought the Pearl Jack, a Chris-craft speed boat 28 feet in length, in May, 1945. It had been built in 1931, and about 1938 a new 150-horse-power gasoline marine engine had been installed in it. The engine

compartment was enclosed with wooden hatches which opened outward. There were two seats forward and one three-passenger seat aft of the engine compartment, and the bilge of the boat between the engine compartment and the rear seat was covered with floor boards. The boat was equipped with two 40-gallon gasoline tanks immediately back of the rear seat.

At the time of the accident Barron, Jr., who was also experienced in the operation of motor boats, owned a speed boat known as the Bonnie B. The evidence established that respondents Denison and Barron, Jr., had entered into an arrangement to operate their speed boats as copartners in the business of carrying passengers for hire. This arrangement was clearly indicated by the fact that, as copartners, they executed a written lease for boat dockage space in Saugatuck, and also by the fact that they opened a joint bank account under the name of "Denison & Barron" and both drew checks on it in connection with their boat operations. They used their speed boats in the carrying of passengers until about July 19th, when Denison left Saugatuck on a vacation trip, leaving his boat, the Pearl Jack, in the possession and care of Barron, Jr. Thereafter during Denison's absence Barron, Jr., operated the two boats alternately on trips with passengers. It is clear that during Denison's absence Barron, Jr., was acting not only as his copartner but also as his agent in connection with the operation of the Pearl Jack. Denison did not return to Saugatuck until July 31st, the day following the accident.

On the afternoon of July 30th Barron, Jr., made trips with his boat, the Bonnie B, and also with Denison's boat, the Pearl Jack. He returned the Pearl Jack to the pavilion dock at Saugatuck at about five o'clock in the afternoon and then made a trip with the Bonnie B. At about 8:30 in the evening he prepared to take the three libelants and other passengers on a trip in the Pearl Jack, which had been tied at the pavilion dock with its engine hatches closed. It should be noted that in preparing to start on this trip, Barron, Jr., did not open the hatches to ventilate the engine compartment and diffuse any accumulated gasoline fumes, a precaution which is recognized as necessary before starting the engine in a boat of this type.

The testimony is conflicting as to whether the explosion and fire occurred when Barron, Jr., attempted to start the engine or immediately after it had been started. In any event, when the boat was a short distance from the pavilion dock, an explosion and fire occurred. Barron, Jr., testified:

"I heard this noise, that was like a puff, * * * and the engine stopped and I looked around and there were flames coming out of the engine compartment. * * * I * * * emptied the contents of the fire extinguisher in and around the rear cockpit. * * * I couldn't really see any flames; but I figure that if there were any flames there, why, the fluid would run down through the cracks in the floor boards and alongside of the cushions and into the bilge, and it might extinguish anything that might be down there. * * * Then I opened the engine hatches. * * * There was quite a bit of smoke, and most of the wiring was smoldering. * * * The paint was blistered * * * on the engine hatch covers * * * on the inside.

"Q. What about the rear cockpit? * * * A. Well, it showed scorch marks * * * right at the back of the seat, on one side. * * *

"There was a flash, I wouldn't actually call it a fire; I would just call it a flash fire. * * *

"Q. Wasn't the fire that you saw there coming out not only of the motor compartment, but from the bilge to the stern, the rear cockpit? A. That is right."

Barron, Jr., admitted that at the investigation by an officer of the United States Coast Guard soon after the accident, he stated: "The flames were blowing from the engine and from the floor board in the after compartment over them (libelants); as soon as the boat lost headway, the flames started burning up straight."

Libelant Klaric testified that when Barron, Jr., attempted to start the engine "it sputtered and then it started and then a backfire and the boat went forward and exploded"; that flames came from the

back side of the engine compartment; that a board in front of the rear cockpit blew out; and that flames came into the rear cockpit where she and the other two girls were sitting. Libelant Ciohon said: "There was a flash and an explosion and a fire, flames. * *˙ * It came from all around or in front of me, and from the side of me." When the flames struck the three girls, they jumped into the water. Klaric was able to swim ashore and was removed by ambulance to the hospital. Kulack and Ciohon, who could not swim, were rescued and removed to the hospital.

■ The law is established that under the above-quoted statute providing for limitation of a vessel owner's liability, the burden was upon respondent Denison as petitioner to prove that the injuries and damages sustained by libelants were "occasioned, or incurred" without his "privity or knowledge." The libelants were not required to prove privity or knowledge on the part of Denison. The Cleveco, 6 Cir., 154 F.2d 605; The Severance, 4 Cir., 152 F.2d 916, certiorari denied 328 U.S. 853, 66 S.Ct. 1344, 90 L.Ed. 1626; The E. Madison Hall, 4 Cir., 140 F.2d 589, certiorari denied W. E. Valliant Co. v. Rayomier, Inc., 322 U.S. 748, 64 S.Ct. 1159, 88 L.Ed. 1579; The Marguerite, 7 Cir., 140 F.2d 491; The Mattie, D.C., 38 F.Supp. 745, affirmed Jacobus Grauwiller Co. v. Reichert, 2 Cir., 136 F.2d 904.

■ The courts have generally held that the statute providing for limitation of the owner's liability should be liberally construed. Coryell. v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363; Capitol Transportation Company v. Cambria Steel Company, 249 U.S. 334, 39 S.Ct. 292, 63 L.Ed. 631; The Severance, supra; The E. Madison Hall supra; California Yacht Club v. Johnson, 9 Cir., 65 F.2d 245. However, the statute was enacted for the purpose of encouraging shipbuilding and the employment of ships in commerce, The Severance, supra; The Trim Too, supra, and it should not be so construed as to permit the owner of a small speed boat carrying passengers for hire on inland waters to escape liability for his negligence or the negligence of his copartner and agent.

■ Respondent Denison was not present at the time of the accident, but he had left his boat in the possession and conrol of his copartner, Barron, Jr., as his agent. Therefore, any negligence on the part of Barron, Jr., in the maintenance, inspection, and operation of the boat was imputable to Denison. In Re Great Lakes Transit Corporation, 6 Cir., 81 F.2d 441, 444, the court said:

"The statute does not require that knowledge be actual; it may be imputed if some one in charge for the owner had general authority to act for him and by the exercise of ordinary care could have discovered the fault. Craig v. Continental Insurance Co., 141 U.S. 638, 12 S.Ct. 97, 35 L.Ed. 886; Spencer Kellogg & Sons, Inc., v. Hicks, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903; In re P. Sanford Ross, 2 Cir., 204 F. 248; Texas & Gulf S. S. Co. v. Parker, 5 Cir., 263 F. 864; Pocomoke Guano Co. v. Eastern Transp. Co., 4 Cir., 285 F. 7; Chesapeake Lighterage & Towing Co., Inc., v. Baltimore Copper Smelting & Rolling Co., 4 Cir., 40 F.2d 394."

In The Silver Palm, 9 Cir., 94 F.2d 776, 780, the court said:

"In proceedings for limitation the owner may not escape liability by giving the managerial functions to an employed person acting as its agent * * *. So far as concerns privity and knowledge such an agent is its alter ego. Craig v. Continental Ins. Co., 141 U.S. 638, 648, 12 S.Ct. 97, 35 L.Ed. 886; Eastern S. S. Corporation v. Great Lakes Dredge [& Dock] Co., 1 Cir., 256 F. 497, '502; Sperry Flour Co. v. Coastwise S. S. [& Barge] Co., 9 Cir., 84 F.2d 785, 786." See also The Cleveco, supra; The Marguerite, supra.

■ In carrying passengers for hire it was respondent Denison's duty to provide a seaworthy boat, to equip it with the usual and necessary appliances, to maintain it in good condition and repair, and to operate it with a high degree of care. In Henson v. Fidelity & Columbia Trust Co., 6 Cir., 68 F.2d 144, 145, the court said:

"This court has said that the duty to use reasonable care in keeping a ship and her appliances in a safe condition e.g., seaworthy, is a continuing duty resting upon

the owner and is nondelegable. Patton-Tully Transp. Co. v. Turner, 6 Cir., 269 F. 334, 337; Globe S. S. Co. v. Moss, 6 Cir., 245 F. 54; Thompson Towing and Wrecking Ass'n v. McGregor, 6 Cir., 207 F. 209. See also Christopher v. Grueby, 1 Cir., 40 F.2d 8. We assume, since it appears to be conceded, that seaworthiness comprehends, not only the condition of the vessel for the purpose of the voyage, but also the safety of the appliances by means of which passengers and freight are embarked and disembarked. The burden to show that a vessel is seaworthy is upon the owner. McGill v. Michigan S. S. Co., 9 Cir., 144 F. 788. * * *

"Our inquiry must therefore be directed to the sufficiency of the precautions exercised by the appellant himself * * * and their adequacy must be measured, not by standards applied to all persons charged with negligence, nor by that standard of reasonable care which measures the duty of a common carrier, either by land or water to its employees, but by that higher standard of care which the law imposes upon a carrier of passengers. It has been said that the care which a carrier owes his passengers is 'to observe the utmost caution characteristic of very careful, prudent men' (Pennsylvania Co. v. Roy, 102 U.S. 451, 456, 26 L.Ed. 141), which is 'the exercise of the utmost human skill and foresight' (Chesapeake & O. R. Co. v. Morgan, 129 Ky. 731, 112 S.W. 859, 860), or, as was said by this court in Pennsylvania Co. v. Clark, 6 Cir., 266 F. 182, 188, 'the exercise upon the carrier's part of extraordinary vigilance, aided by the highest skill,' or the 'greatest and highest degree of care and caution approved by human knowledge and experience and consistent with the nature, extent and operation of its business.'"

In The Pegeen, D. C., 14 F.Supp. 748, 752, 753 the court said:

"Thus it is his (owner's) duty to keep the ship and her appliances in a safe condition. * * *

"It is the duty of the owner * * * to provide the vessel with a competent master and a competent crew; and to see that the ship when she sails, is in all respects seaworthy. He is bound to exercise the utmost care in these particulars—such care

as the most prudent and careful men exercise in their own matters under similar circumstances; and if, by reason of any fault or neglect in these particulars, a loss occurs, it is with his privity within the meaning of the act."

In The Maria, 4 Cir., 91 F.2d 819, 823, the court said:

"His (owner's) duty is not delegable and he must show not only that he employed competent agents, but also that they actually exercised due diligence to make the ship in all respects seaworthy and properly manned, equipped, and supplied. International Nav. Co. v. Farr & Bailey Mfg. Co., 181 U.S. 218, 225, 21 S.Ct. 591, 45 L.Ed. 830; The Southwark (Martin v. Southwark), 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65."

The questions as to whether or not the Pearl Jack was seaworthy when it left the dock in Saugatuck, and whether or not it was equipped, inspected, and operated with the required high degree of care, must be determined from the evidence adduced. The testimony is conflicting as to the exact cause of the explosion and fire. Denison testified that he had operated the boat nearly every day from the time he purchased it until he left Saugatuck about July 19th; that the motor had not been acting normally; that it needed adjustment from time to time; and that at times the port gasoline tank did not feed properly. However, the owner of a boat yard, who had examined and worked on the Pearl Jack about a week prior to the accident, testified in substance that at that time it was in good condition. The engineer of the Saugatuck fire department, who had had experience as a boat mechanic, examined the Pearl Jack within an hour after the accident. He testified that the inside of the engine hatch was scorched and that the floor boards and rear seat showed signs of fire. He stated that there were rust holes in the port tank; that gasoline was leaking from it; and that there was gasoline in the bilge. He further testified:

"Q. Assuming that gasoline had leaked into the bilge and that the boat had been idle, that is, stopped with the engine off, for a period of 15 to 20 minutes and then an attempt was made to start the motor, I will ask you whether or not that could, in

your opinion, cause the explosion that occurred in this case? A. Why, certainly.

"Q. What would cause the explosion? * * * A. Spark. * * * From the motor, backfire, spark from the exhaust manifold, or an exhaust pipe.

"Q. What would that spark ignite? A. The gas fumes immediately at the end of the motor.

"Q. Gas fumes coming from where? A. From the bilge. * * *

"Q. Assuming that the boat had been idle, the engine had been idle and the boat had been stopped at the dock, with the hatch covers closed; whether that would increase the danger of an explosion in the event [it] was later attempted to start the motor? A. Very much so."

Two witnesses who had made a trip on the Pearl Jack in the afternoon preceding the accident testified that at that time there was a strong odor of gasoline in the boat. Before starting on the evening trip, the boat had lain at the dock for some time with the hatches on its engine compartment closed, and two of the libelants testified that while they were sitting in the boat prior to starting, they smelled a strong odor of gasoline. The evidence established that in boats of the Pearl Jack type the hatch covers should be opened for ventilation before starting the engine in order to avoid the danger of explosion and fire from accumulated gasoline fumes in the engine compartment. However, on this occasion Barron, Jr., did not open the hatch covers before attempting to start the engine. Furthermore, he did not inspect the engine compartment and the bilge to ascertain if there was an accumulation of gasoline or gasoline fumes. This was negligence on his part in the operation of the boat.

A police officer, who was on shore about 150 feet from the Pearl Jack, testified that he saw the flash, heard the explosion, and saw flames in the back end of the boat. An automobile mechanic, who heard the explosion and who examined the Pearl Jack immediately after the accident, said there was smoke in the bilge of the boat, and that the hatch doors on the motor compartment were scorched, and that one of the floor boards over the bilge was loose and out of place. A lieutenant in the

Coast Guard marine inspection service, called as a witness by respondents, who was familiar with motor boats, inspected the Pearl Jack the day after the accident to ascertain if it was equipped as required by law. He testified that he found the boat properly equipped; that he put his hand on the bottom of the port tank and found no evidence of rust holes or leaks in that tank. He said that the condition of the inside of the motor compartment indicated a forceful explosion; that the paint on the inside of the hatch doors was burned; and that in the rear cockpit there were "black smudges underneath on the bilge, the sides below the floor boards * * * as if a flash flame had passed over in a hurry sort of * * * a scorch." He stated that in his opinion the explosion and fire were caused by gasoline fumes from gasoline in the bilge of the boat. He further said:

"Q. Isn't it proper practice before starting a motor, such as this gasoline motor, to give it air, * * * to open the hatch doors * * * so that the gas fumes can escape? A. That is right.

"Q. That is ordinary practice among operators of motor boats, isn't it? A. Yes.

"Q. And in your report to your commander you did report that the boat was not properly ventilated, didn't you? A. Yes, I did. * * *

"Q. If there were fumes that accumulated in the motor and they got back there in the bilge, they would stay there, wouldn't they? A. Yes, I believe they would."

Respondent Denison, who examined the Pearl Jack two days after the accident, said that the inside of the motor hatches and the seats in the rear cockpit were blistered; and that there were smoke smudge marks between the engine-bed stringers leading to the rear cockpit. A few days after the accident Denison took the boat to a boat yard for repairs. The owner of the yard, who was called as a witness by respondents and who was experienced in the operation and repair of motor boats of this type, testified that the paint underneath the engine hatches and in the rear cockpit was blistered; that there were no marks of fire underneath the floor boards; and that there were no indications

of a gasoline-fume explosion in the bilge of the boat. He said that certain gaskets on the engine were blown out and that, in his opinion, this resulted from an internal combustion in the motor crank case. He further testified:

"Q. Have you an opinion as to what caused the explosion in the base of the engine of the Pearl Jack? * * * A. That I do not know, but when gasoline and oil is mixed together and gets to a certain temperature the gasoline will vaporize in there, and will ignite in the crank case. * * * The engine could backfire and cause it. * * * It would not harm anything outside of the engine, except what came into direct contact with the spray of oil and gasoline, which had ignited, and which came out of the motor. Whatever came in the path of this spray, which is like blow-torch, would be scorched. * * * Whatever the flames hit, it would ignite; if there was raw gasoline there it would fire the gasoline; if there was oil there it will burn the oil. * * * If there was any gasoline or anything in the bilge, it will travel any distance as far as the gasoline will run.

"Q. In your opinion * * * could an internal explosion such as you have described in an engine of this type and size have caused a sheet of flame to backtread all the way to the after cockpit of this boat through the bilge? A. It could, depending on the amount of gasoline mixed in with the oil in the crank case."

This witness further testified that gasoline fumes could accumulate in the bilge of a boat of this type in its ordinary use. He said that there was dirt in the sediment bowl of the fuel pump; that he removed the port gasoline tank, which had been repaired by soldering and found rust, scale, dirt, and a rag in it but that he did not find any holes in the bottom. He said that the tank was not fit to be used. The port tank was not put back in the boat, and there was evidence that at later times the boat was operated with a rock in place of the port tank to balance the weight of the starboard tank. The boat-yard owner further testified that he cut up the port tank, removing one end and a portion of the sides, and junked the rest. This was unfortunate because, although the mutilated tank was retrieved and put in evidence, it was impossible to determine whether or not there had been holes or leaks in the portion removed.

In any event, the explosion and fire on the Pearl Jack were not a usual or normal occurrence and could only have resulted from the presence of gasoline or gasoline fumes which had been negligently permitted to accumulate in the base of the engine or in the bilge of the boat or in both. In considering the cause of an explosion and fire which occurred on a boat, in the case of Leathem Smith-Putnam Navigation Co. v. Osby, 7 Cir., 79 F.2d 280, 282, 283, certiorari denied 296 U.S. 653, 56 S. Ct. 370, 80 L.Ed. 465, the court said:

"There was no evidence of the presence of anything that might explode other than gases. This fact, under the doctrine of res ipsa loquitur, upon which the District Court relied, justified the finding of liability. * * *

"Appellant argues that to sustain the decree, this court must build up an inference based upon other inferences and that before the doctrine of res ipsa loquitur can apply there must be direct proof of the cause of the accident. We think the argument is fallacious. Truly, there must be proof of an accident, and there must likewise be sufficient proof that it occurred out of the ordinary course of events; that it was extraordinary in character. Proof of the accident and of what caused it need not be by direct evidence or by the testimony of eye witnesses. Indeed, the rule has its origin and reason in cases frequently arising where there is no direct evidence as to the exact cause of the accident. In substantially all cases, the evidence offered in support of the claimant's case, under this rule, is necessarily indirect or circumstantial, but it is none the less competent. So, here, there was an explosion in a room where there was nothing to cause it other than gases. There were present methane and carbon monoxide. Presence of explosive gases, absence of any other explosives, difficulty with gases in the past and the fact that an explosion could not have occurred, except through some extraordinary cause, create a situation making the accident of such an unusual character as to justify consistently only the

810

finding that the accident was due to negligence of those having possession or control of the things where the injury occurred. This inference rightfully arises, not merely because the accident speaks for itself, but because the facts are such that unless other explanation be given, the only fair and reasonable conclusion is that the accident was due to some omission of duty. This doctrine is directly applicable here."

In The New Berne, 4 Cir., 80 F.2d 244, 247, 248, the court said:

"The origin of gasoline fires must in most cases be established by circumstantial evidence; and the probative effect of such evidence ought not be disregarded * * *. In a number of reported cases, the courts have not hesitated to fix responsibility for gasoline fires and explosions under circumstances where the evidence as to the immediate cause has been far less satisfactory than in the case at bar. See Elkton Auto Sales Corporation v. State of Maryland, 4 Cir., 53 F.2d 8; Christopher v. Grueby, 1 Cir., 40 F.2d 8; Sinclair Navigation Co. v. F. J. Bauer Towing Line, Inc., D.C., 27 F.2d 606; Erie R. Co. v. Murphy, 2 Cir., 9 F.2d 525; Standard Oil Co. v. R. L. Pitcher Co., 1 Cir., 289 F. 678."

In the case of The Rambler, 2 Cir., 290 F. 791, the court said:

"The explosion destroyed the Rambler * * *. The reason for disaster remains wholly unknown, so far as any direct evidence of recent acts is concerned. * * *

"The facts upon which liability depends are simple in the extreme. The Rambler's boiler blew up, although of good, if not superior, make, shortly after satisfactory inspection, and while in charge of duly licensed men. By the contention of the petitioner, no reason is shown for the explosion. We have no doubt that these facts present a clear case for applying the rule commonly spoken of as that of 'res ipsa loquitur.' * * *

"Since all experience shows that good boilers, well taken care of and managed, do not ordinarily explode, we think that the Rambler's boiler exploded, not because it was a poor boiler, but because it was mismanaged at and shortly before the moment of disaster."

See also The Columbia, D.C., 25 F.2d 516, 517, affirmed 2 Cir., 25 F.2d 518, certiorari denied Union Ferry Co. of New York & Brooklyn v. Moore, 277 U.S. 595, 48 S.Ct. 530, 72 L.Ed. 1005.

However, it would seem that the above-discussed doctrine of res ipsa loquitur need not be applied in the present case, as there was evidence from which the cause of the explosion and fire on the Pearl Jack could be determined. The testimony established that the explosion occurred in the base of the engine from an accumulation of oil, gasoline, and gasoline fumes; that gasoline fumes had also accumulated in the bilge of the boat, either from gasoline leaking from the port tank or from gasoline fumes escaping from the engine; that the explosion blew out gaskets in the engine which permitted flames to escape from the engine compartment; that the flames in the rear cockpit came either from the engine compartment or from the ignition of accumulated gasoline fumes in the bilge or from both sources.

The court concludes that the explosion and fire and libelants' damages resulted from the negligence of respondent Denison in failing to keep his boat and its equipment in a safe and proper condition, and in the negligence of respondent Barron, Jr., in failing to inspect the engine and engine compartment, the gasoline tanks, and the bilge of the boat, and in failing to open the hatches and ventilate the engine compartment before starting the engine. This negligence of Barron, Jr., was imputable to his copartner and principal, respondent Denison. Therefore, the negligence which caused libelants' injuries and damages was legally within the "privity or knowledge" of respondent Denison, and his petition for limitation of liability should be denied.

The court has hereinbefore concluded that respondents Denison and Barron, Jr., were copartners in connection with the operation of the Pearl Jack and the Bonnie B in carrying passengers for hire. However, libelants, and also respondent Denison, claim that respondent Barron, Sr., was engaged in a joint venture or copartnership arrangement with Deni-

son in the operation of these boats, and that he should be held equally liable with Denison for any damages resulting from the accident in question. Barron, Sr., was the president, manager, and principal stockholder of the West Michigan Oil Company, a corporation, and his son, Barron, Jr., had worked for that company prior to his copartnership arrangement with Denison. The company through Barron, Sr., had from time to time loaned and advanced sums of money to the son, Barron, Jr. This money was used by the son principally in connection with his boat business. These loans were charged to the son on the books of the oil company. Subsequent to the accident in question Denison and Barron, Jr., bought and sold several other motor boats, and in the spring of 1946 they took two of these boats to Florida and sold them there. Denison received the proceeds from these sales, and Barron, Sr., demanded that his son's share thereof be paid on the oil company loans. As a result of repeated interviews Denison gave Barron, Sr., a check for $6,000, which he deposited in the account of the oil company to apply upon the indebtedness of his son. It would serve no useful purpose to discuss further in detail the conflicting testimony relating to the transactions between Barron, Sr., Denison, and Barron, Jr. Suffice it to say that the evidence is convincing that Barron, Sr., was not engaged in a joint venture or copartnership arrangement with Denison. Therefore, he is not liable for any damages resulting from the accident involved in the present case.

The court concludes that respondents Denison and Barron, Jr., are liable to the libelants for their respective damages resulting from the explosion and fire on the boat Pearl Jack, owned by Denison and operated by Barron, Jr., as his copartner and agent. There is no material dispute regarding the personal injuries sustained by the libelants or the amount of their hospital, medical, and other expenses.

Libelant Kulack was confined in hospitals in Michigan and Chicago, Illinois, for about four weeks. Medical testimony established that her eyebrows, eyelashes, and the hair on her forehead were burned off; that she had second-degree burns on her left hand and forearm; second-degree burns on her right hand and forearm; second-degree burns on her left leg above the knee; second-degree burns on her right leg; third-degree burns on her left foot and ankle; and that there were permanently scarred areas on her legs and ankles. The testimony indicates that these burns and scars would not cause any permanent limitation of the use of her arms and legs, but that she would experience some discomfort from the scars; also that she suffered some mental disturbance as a result of the accident and her injuries. She incurred expenses, including ambulance service, hospital and medical care, in the amount of $875.75. Prior to the accident she had received a salary of $40 a week, and as a result of her injuries she was unable to work for about nine months.

Medical testimony established that libelant Klaric had permanent scars from third-degree burns on both legs, extending from the ankle to the knee; a permanent scar about one by three inches on her right knee; scars of a lesser degree around the inner and outer sides of her legs; and minor scars extending about six inches above each knee. The testimony indicates that these burns and scars would not limit the motion of her legs but would cause permanent disfigurement and some discomfort. She expended $338.30 for ambulance service, hospital and medical care. Prior to the accident she received a salary of $55 a week and was unable to return to her work as an office clerk for about eight months.

Medical testimony established that libelant Ciohon had permanent scars from third-degree burns on both of her feet and ankles; second-degree burns on her left hand and forearm; burns on her right thigh which left small scars; and face burns which left no scars. The hair on the front of her head was burned off. The testimony indicates that the burns and scars would not limit the motion of her feet, legs, hand, and arm. She was confined in the hospital for about three weeks. She incurred expenses, including ambulance service, hospital and medical care and loss of clothing, in the amount of $576.90. She was unable to resume her former work as an office clerk, for which she received a salary of $42.50 a week, for about 14 weeks.

The court concludes that libelant Kulack is entitled to recover from the respondents Denison and Barron, Jr., her expenses of $875.75 and also the sum of $3,500 as damages for her pain, suffering, permanent injuries, and loss of income; that libelant Klaric is entitled to recover from respondents Denison and Barron, Jr., her expenses of $338.30 and also the sum of $3,500 for her pain, suffering, permanent injuries, and loss of income; that libelant Ciohon is entitled to recover from respondents Denison and Barron, Jr., her expenses of $576.90 and also the sum of $2,500 for her pain, suffering, permanent injuries, and loss of income.

1. An order will be entered denying the petition of respondent Denison for limitation of his liability.

2. Judgment of no cause of action will be entered in favor of respondent John T. Barron, Sr.

3. Judgment will be entered in favor of libelant Kulack and against respondents Denison and Barron, Jr., jointly and severally, in the sum of $4,375.75.

4. Judgment will be entered in favor of libelant Klaric and against respondents Denison and Barron, Jr., jointly and severally, in the sum of $3,838.30.

5. Judgment will be entered in favor of libelant Ciohon and against respondents Denison and Barron, Jr., jointly and severally, in the sum of $3,076.90.