THE EASTERN KNIGHT.
THE S. M. SPALDING.

PAN–AMERICAN PETROLEUM & TRANSPORT CO. v. UNITED STATES.

District Court, S. D. New York.
Oct. 19, 1922.

disableddisabled

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark, of New York City, of counsel), for S. M. Spalding and Pan-American Petroleum & Transport Co.

Wm. Hayward, U. S. Atty., of New York City (J. K. White, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

KNOX, District Judge.

On the morning of April 5, 1920, the steel tanker, S. M. Spalding, of 7,175 gross tons, a length of 435 feet, and a beam of 56 feet, was in the neighborhood of two or three miles south–southwest, of Ambrose Lightship. She was loaded, and bound from Tampico to New York.

In the same vicinity was the steamer, Eastern Knight, also loaded, and bound from the west coast to New York. She is a steel vessel of 6,588 tons, gross, 415 feet in length, and has a beam of 55½ feet.

The preceding day, a heavy fog had set in along the Jersey coast, and continued through the night, and into the morning of April 5. As a result both vessels were running at a reduced speed, and sounding the regulation fog signals.

Each vessel had heard the whistles of the other and each maintained a sharp lookout for any approach of danger. Notwithstanding, at about 7:14 o'clock a. m., the vessels collided, the stem of the Spalding coming into contact with the port bow of the Eastern Knight, some 20 feet abaft her prow. Both ships sustained considerable damage, and, in due course, a libel was filed on behalf of the Spalding. It was responded to by an answer and a cross suit filed by the government, as owner of the Eastern Knight.

First discussing the latter's version of the collision, it appears that she was proceeding at half speed, about 4½ or 5 knots per hour, and was steering a course of north 45° west (P. S. C.) when she heard on her port quarter, about five points abaft the beam, several

short blasts of a whistle. These, it subsequently developed, had been blown by the Spalding. Further signals being heard, they were recognized as "coming closer," and their bearing seemed to be changing from abaft the beam to abeam. During this period, the ·Eastern Knight maintained her own signals, and her master and chief officer were at the port end of the bridge, endeavoring to locate the vessel whose blasts they heard.

While so engaged the whistle of the Spalding sounded close at hand, and, almost immediately following, the vessel herself loomed up out of the fog, about 175 feet away, and bearing a little ahead of the beam. Up until this moment, the Eastern Knight had been under way at half speed. Her engines, upon the Spalding's appearance, are said to have been put full speed astern, and her helm to have been placed hard aport. Three minutes are claimed to have passed during which the Spalding came on with undiminished speed, and without change of course, and struck the Eastern Knight. The vessels hung on for a moment or two when, the Spalding's engines being placed in reverse, and those of the Eastern Knight ahead, clearance was had.

Each ship says that it then attempted to communicate with the other by wireless, but receiving no response, each busied itself with its own injuries, and lost the other to sight.

In giving consideration to this account of the accident, and to the alleged movements of the Eastern Knight, the following circumstance is to be borne in mind. Her engine room smooth log bears evidence of several erasures, not only as to the entries of April 5, but also as to previous dates. These are sought to be explained in this way: That, in making entries, grease would sometimes be dropped on the pages of the log, and that the erasures followed an attempt to remove any dirt or smear that might thus be made so as to have the log present a clean appearance.

This explanation is not improbable, and it might now be accepted were it not for the fact that during the examination of Gunderson, chief engineer for the Eastern Knight, two sheets of paper, clearly taken from the pad whereon rough scrap log entries were ordinarily noted, dropped from within the pages of the smooth log. The entries on the sheets of paper and those upon the pages of the smooth log for the day in question do not correspond.

Upon the sheets of paper referred to it appears that the Eastern Knight's engines

were put full speed ahead at 7:12 o'clock a. m., two minutes before the collision which, according to Eastern Knight time, occurred at 7:14 o'clock a. m. In the smooth log the 7:12 a. m. entry, which is one wherein an erasure shows, indicates the engines to have been placed full speed astern. The man who made the scrap log entries was not called as a witness for the Eastern Knight, although, at one point in the course of the testimony, counsel for the government stated that he would be produced or his deposition taken. None of the witnesses called by respondent could make any adequate explanation of the discrepancy in the entries, and there seems no escape from drawing from the circumstance an inference decidedly unfavorable to the Eastern Knight.

Prior to this development, and before the existence of a portion of the scrap log entries of the Eastern Knight was known to witnesses for the Spalding, their examination had been concluded. In giving their testimony several of such witnesses testified that when the Eastern Knight was first seen she carried "a bone in her teeth." And thus, some corroboration is given to one allegation of fault made against her, and which in my judgment is fairly well established by her own papers, viz., that she was proceeding in a heavy fog at a high and dangerous rate of speed. Such must be the result, I think, even if the "full speed ahead" order at 7:12 a. m. be considered to have been "full speed astern." It will be recalled that Captain Meyers of the Eastern Knight admitted his boat to have been making 4½ to 5 knots per hour when the Spalding was seen only 175 feet away. Under such condition, I don't believe the headway of the Eastern Knight could have been sufficiently checked by a full astern order to avoid collision. The master of the Eastern Knight said that his ship would forge through the water for one-third or one-half of her length before coming to a stop under the influence of reversed engines; and, upon such estimate, she was practically bound to strike the Spalding even though that ship was dead in the water. Captain Meyers, however, claims that the Spalding came on towards him, and that he, being stopped, and swinging off, was run down.

In the light of what I have said, this seems improbable, but in any event, it necessitates an examination of the Spalding's proof to ascertain if she caused the collision or made contribution to it.

Captain Locke of the Spalding testified that he was proceeding at half speed or less upon a course north, 20° east, true, when, shortly after 7 o'clock a. m. he heard the Eastern Knight's whistle about four points on his starboard bow. He immediately ordered the engines to be stopped, and then placed "slow ahead." The latter command brought about a speed of from 1½ to 2 knots, and was resorted to to afford steerageway to the ship. Previous to this it had been discovered that the Spalding was being set inshore by the current, and that she had none too much water beneath her keel. Hearing further blasts from the Eastern Knight, the Spalding's engines were again stopped "because the whistle was getting closer and closer" and Locke "wanted to keep the ships apart and didn't know which way the other ship was steering."

The chief officer was then sent to take a sounding, and in his absence Locke would answer the whistles from the Eastern Knight, and, if the blasts seemed to lag, he would challenge her with further signals. He was anxious to let the other ship learn his position for he believed she might be coming south from Ambrose Lightship with no place to go inside the Spalding.

This procedure continuing for perhaps two minutes, the chief officer came running on to the bridge with the information that he could "see a large cloud there," and looking to starboard where he obtained a range of some vision beneath the fog, Locke observed white foam at the bow of an on-coming ship. Thereupon, the mate rang for reversed engines, and this further checked the Spalding. The other ship, however, came on, and in crossing the Spalding's bow struck the stem with the bluff of her bow, causing the tanker to take a list of 15 degrees to port, and throwing her head four points to westward.

By the Spalding's clock the ships struck between 7:11 a. m. and 7:12 a. m., and her movements as I have described them are, in substantial detail, supported by her chief engineer. The orders which he received from the bridge and put into execution are as follows:

7:05—stop.
7:06—ahead slow.
7:08—stop.
7:11—astern full.

In obedience to the last order the engines were opened, and, the order being at once repeated, the engineer realized his ship was facing an emergency, and he endeavored "to give the captain all he had." In recording the time of the successive orders referred to, minutes were not split and it is probably for

that reason that the Spalding's record of the jar of impact is shown to have occurred at 7:11 a. m.

At 7:13 the engines were ordered stopped, and 7:14 they were again put ahead. This was doubtless the movement designed to clear the ships, and it was followed with "ahead slow" at 7:19; "stop" at 7:22; "ahead half" at 7:24; "ahead slow" at 7:37; and "ahead half" at 7:55. Over the time intervening since 7:14 the Spalding's damage was being ascertained. When it was found that, although her stem was badly twisted and other injuries had been sustained, she was not fatally hurt, she went on her way, and shortly afterwards was hailed by a pilot, who was taken aboard, and the ship made port.

To the same general effect is to be added the testimony of the Spalding's second officer, as well as that of her quartermaster and lookout.

■ Ordinarily, the testimony of A. H. Hope, first officer of the Spalding would be most desirable and important. He was, however, not called. So far as his nonappearance upon behalf of his ship is concerned, the reason is that as far back as February 25, 1920, he and Captain Locke had been having trouble. Indeed, upon one occasion, and perhaps two, the mate had assaulted the master. An account of one such occurrence is shown by the log of February 25, and on March 22, the mate was off duty on account of drunkenness. On April 12, charges against the first officer were made by Captain Locke before the steamboat inspectors at this port. Hope was given notice thereof and a date was set for trial. No appearance for the mate being made, the trial proceeded and Hope was adjudged guilty. By way of punishment, his license was suspended for six months. There are, therefore, obvious reasons why Hope should not be called upon behalf of the Spalding.

At one stage of the proceedings growing out of the collision, Hope went to officials connected with the government and made affidavit that he falsified the Spalding's log at the direction of Captain Locke. From this, of course, it might be inferred that the latter's version of the collision is not correct.

It is, however, of material circumstance that the government did not see fit to call Hope as its own witness. Under this state of affairs, I must disregard Hope's affidavit, and draw no unfavorable inference from his failure to appear as a witness for the Spalding.

■ When giving testimony Captain Locke was subjected to a thorough cross-examination and his story was unshaken. There is, therefore, no reason why it should be disregarded. Accepting it, with such corroboration as it has received from other members of the crew, I find this situation, viz.: That the Spalding was being navigated in conformity with the rules and regulations prescribed for such conditions as existed at and prior to the accident. The Eastern Knight was close by Ambrose Lightship in a dense fog, a place where she had every reason to believe that other vessels would be going in or coming out. Nevertheless, by her own admission, she was under way at a speed of between 4 and 5 knots. This, it seems to me, must be regarded as immoderate.

It does not evince a "careful regard for existing circumstances and conditions." The Eastern Knight had clearly heard the Spalding's whistle, and, although she believed it to be abaft the beam, she also recognized it as coming closer, and as bearing more on the beam. She should have appreciated the notorious fact that the direction from which a sound seems to come through a dense fog is not to be implicitly relied upon. Prudence demanded that, if the Eastern Knight should continue to go forward, she should not do so with any greater speed than was required to keep herself under control. Had she observed this caution, the collision, even if it might not have been avoided, would doubtless have been far less serious, both to herself, and to the Spalding. I have, in consequence, concluded that she has not sustained the burden of showing that her faults did not contribute to the collision.

As for the Spalding, I do not see what further precautions for safety she could have resorted to. She did, I think, all that could reasonably be expected of her, and she is accordingly entitled to exoneration, and to a decree for full damages against the respondent.