## THE AZUA.
## THE CITY OF ATLANTA.

**SEXTON v. OCEAN S. S. CO. OF SAVANNAH (two cases).**

**WATLINGTON et al. v. SAME.**
**CHRISTIAN v. SAME.**

District Court, S. D. New York.
April 24, 1931.

Crowell & Rouse, of New York City (E. C. Rouse, of New York City, of counsel), for libelants Sexton and Christian.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City, and Burnham, Bingham, Gould & Murphy, of Boston, Mass. (Miles Wambaugh, of Boston, Mass., of counsel), for libelants Watlington and Conyers.

Haight, Smith, Griffin & Deming, of New York City (Charles S. Haight and Henry M. Hewitt, both of New York City, of counsel), for respondent.

PATTERSON, District Judge.

A collision occurred between the schooner Azua and the steamship City of Atlanta on May 15, 1930, while the vessels were in a dense fog off the New Jersey coast. The Azua straightway sank, carrying down with her the captain, mate, and one seaman. Four members of the crew were picked up by the City of Atlanta. Four libels were filed against the Atlanta—one by a part owner of the Azua, one by the owner of the cargo, one by the administrator of the deceased captain, and one by the administrator of the deceased mate.

The Azua was a four-masted schooner, 171 feet in length, with a net tonnage of 613 tons. She was on a trip from New York to Bermuda, laden with coal. The collision occurred at about 12:37 in the early morning of May 15th. The course of the Azua had been southeast by south since midnight. There was a light breeze from the southwest, and the Azua was making very little speed. She had been in a fog for several hours; from midnight on the fog had been thick. The only activity on board was that at the time of changing the watch at midnight two more sails had been spread; this job, it is said, took from ten to fifteen minutes. The two men on the old watch had just gone below after working on this job, had removed their oilskins, and had made ready to eat a lunch when the captain saw the Atlanta nearby off the schooner's port side, and gave the alarm. I am satisfied that the Azua had proper lights. The only point regarding her conduct which is in serious controversy relates to her fog signals. She had a mechanical foghorn of the type ordinarily used by sailing schooners, purchased just before this trip. All four survivors stated that it was being blown continuously. It was on the forehatch, just behind the forecastle house, and was being operated by the mate on the port side. One of the survivors testified that it was tied to the hatch but in such a way that it could be moved in any direction. The Azua was then on the starboard tack, and the booms were on the port side, trimmed in close, the booms being about 7 feet above the deck. There is testimony that McLean was a capable and experienced master. He owned three-fourths of the schooner. In the collision the bow of the Atlanta struck the Azua amidships and the Azua went down before the crew could lower the lifeboat at the stern. The

survivors were picked up by a boat from the Atlanta, which seems to have done everything possible in the way of rescue.

The Atlanta was bound from New York to Savannah, and was on a southwest course at the time of the collision. She is a large steamer. The second officer came on watch at midnight. He made a statement two days later. In this statement he says that when he came on watch the visibility was fair, but that shortly after 12:30 the vessel ran into a bank of fog without the slightest warning of its presence; that he immediately blew a whistle of from three to five seconds, then hurried across the pilot room to the captain's door, and told him of the fog, at which time he heard the faint sound of a foghorn. The lookout also reported this foghorn. The second officer, on returning to his station, blew the whistle again, and at the same time heard the foghorn a second time, quite loud and straight ahead. He then signalled the engine room to stop the engine. The captain reached the pilot house, and ordered hard aport and full speed astern. The schooner was then seen across the bow and the collision occurred an instant later. The testimony of the second officer at the trial was substantially the same as his written statement. He added that not more than fifteen seconds elapsed between the time when the Atlanta struck the fog and the time of the collision. His account of the behaviour of the Atlanta was corroborated by the captain, pilot, engineer and lookout, and to a minor extent by others on the Atlanta. It appears that at the time the Atlanta was going at full speed, twelve knots an hour.

There are two or three features in the case, however, that tend somewhat to cast doubt upon the accuracy of the story told by the witnesses for the Atlanta. For one thing, her log shows an erasure as to the time of the collision. As it now stands, the log gives 12:37 as the time, but originally it bore another figure, probably 12:36. Merchants' & Miners' Co. v. Nova Scotia S. S. Corp. (C. C. A.) 40 F.(2d) 167, 172; The Eastern Knight (D. C.) 56 F.(2d) 428, 1929 A. M. C. 1181. Again, the captain testified at a hearing on May 31, 1930, before the local inspector at Savannah, that he was called by the second officer "at about 12:35.45 A. M." At the present trial he could not recall having given any such testimony. It was certainly strange for him to have noted the minutes and seconds of this call; it being borne in mind that at that time he did not know that a collision was imminent. All that the second officer had told

him was that there was a fog. But, if his statement was accurate as to the time when he was summoned, it contradicts the estimate of the second officer that the Atlanta was in the fog only fifteen seconds before the collision, for the time of the collision is placed by the Atlanta witnesses at 12:37. A third incident is that the report written out by the captain on the day of the disaster, addressed to the superintendent of his company, indicates that the order for full speed astern came after the collision rather than before it.

■■ I am of opinion that the merits are with the libelants. There is no doubt that the Atlanta violated the first part of article 16 of the International Navigation Rules, requiring every vessel in a fog to go at a moderate speed. The fog was very dense, and a speed of 12 knots in such a fog at such a place is excessive. Even if it be true that there was no warning of the proximity of the fog bank, it was the second officer's duty upon striking the fog to take immediate measures to bring down the speed. Admittedly he did not do this; he first blew a whistle and then went to report the fog to the captain, the vessel's speed meanwhile continuing at 12 knots. The breach of the regulation is therefore plain. The respondent contends, however, that this fault did not cause the accident. In making this contention, the respondent must abide by the rule that a vessel infringing a positive regulation is bound affirmatively to show that such violation did not contribute to the collision. The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148; The Walter Franks (C. C. A.) 299 F. 319. The contention is based upon testimony that the collision occurred about fifteen seconds after reaching the fog, and upon tests which, it is said, prove that the Atlanta's speed could not have been appreciably diminished in that space of time. But estimates of time by witnesses are notoriously unreliable, and I do not regard it as established that there was only a fifteen-second interval. I think that the Atlanta was at fault for not reducing speed immediately on entering the fog, and that her dereliction in this respect is sufficient to account for the collision. The Cherokee (C. C. A.) 45 F.(2d) 150; The Pallanza (C. C. A.) 189 F. 43.

■ I cannot see that the schooner was at fault in any particular. Her speed was slow; her lights were burning. It is said that her fog signals were inadequate. The argument is twofold: First, that the horn was not being worked; and, second, that it was improperly located. As to the first, the testi-

mony of all the survivors of the Azua is that the foghorn was continuously blown. The men on the Atlanta acknowledged that two blasts were heard. The only basis for the respondent's argument is that sails were being hoisted shortly before the collision; the conjecture being made that the entire crew was so engrossed in this operation that the foghorn was neglected. This conjecture is altogether too attenuated. As to the second branch of the argument, it is claimed that the noise of the horn was smothered by the rail and the sails. The proof is that the horn was on the port side of the forehatch and was being blown by the mate. The rail was open, the sails closehauled, and fully 5 feet above the horn. I do not see how there could be any interference with the sound reaching a ship approaching amidships on the port side. A position in front of the forecastle house might have been better under certain conditions, and the blast would probably have carried further to ships off the bow of the Azua. But I cannot say that the Azua was at fault in having the horn where it was, and in my opinion the position of the horn had nothing to do with the collision. The Pallanza, supra. If the point be regarded as a doubtful one, the schooner is entitled to the benefit of the doubt in a case like the present one, where the steamer's fault suffices to account for the disaster. The Cherokee, supra; The City of New York, 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84; The Oregon, 158 U. S. 186, 15 S. Ct. 804, 39 L. Ed. 943.

It follows that the libelants in these cases are entitled to decrees for full damages, with reference to a master on the damages, and that the respondent's set-off is dismissed.