**THE ERNIE MILLER.**
**In re MILLER.**
**No. 541.**

District Court, E. D. Louisiana,
New Orleans Division.

May 24, 1947.

Lemle, Moreno & Lemle, of New Orleans, La., for petitioner

Phelps, Dunbar, Marks & Claverie, of New Orleans, La., for claimant, William A. D'Entremont.

Deutsch, Kerrigan & Stiles, of New Orleans, La., for other claimants.

PORTERIE, District Judge.

Ernest S. Miller, as owner of the Diesel Tug Ernie Miller, prays for exoneration from liability for any loss, damage, injury or destruction, resulting from a collision which occurred on January 18, 1941, in the Intracoastal Waterway (Lake Charles Ship Canal) at or near Ellender's Ferry, Louisiana, between the tug Ernie Miller and the S.S. Sinaloa; or if exoneration be denied, then he prays for limitation of petitioner's liability to the value of the tug Ernie Miller and her pending freight.

Subsequent to the collision, Captain William A. D'Entremont, the master of the S.S. Sinaloa, filed a libel in the United States district court for the Eastern district of Louisiana, Baton Rouge division, against Ernest S. Miller, a resident of Plaquemine in the parish of Iberville and the tug Ernie Miller, then at the port of Plaquemine within the Baton Rouge division. The tug Ernie Miller was seized under process issued.

Thereupon, Ernest S. Miller filed his petition for exoneration from or limitation of liability in the United States district court for the Eastern district of Louisiana, Baton Rouge division. Later, on motion of all parties, the case was transferred to the New Orleans division, where it is number 541 of the docket.

On the filing of the petition, the court appointed J. Clyde Dean of Plaquemine, trustee, to whom Ernest S. Miller delivered the tug Ernie Miller, transferred his interest in the tug and in her pending freight, and, also his claim against the colliding steamship, the Sinaloa, for the damages to the Ernie Miller coming out of the collision.

On order of court and after due advertisement, the tug Ernie Miller was sold at public auction at Plaquemine, Louisiana, to the highest bidder for the sum of $5,700; the sale was confirmed by the court. The amount of the pending freight transferred by Ernest S. Miller to the trustee

was $176.41 and accordingly, the trustee had in his possession the sum of $5,878.41. Out of this sum, pursuant to orders of court, the trustee paid certain costs aggregating $97.42 and his fee of $250 and deposited the balance $5,530.99 in the registry.

Claims were filed in this proceeding by Captain William A. D'Entremont on his own behalf and as bailee on behalf of the owner, officers and crew of the S.S. Sinaloa, and on behalf of the cargo laden on the S.S. Sinaloa and all persons interested therein in the sum of some $85,000. There have also been a number of cargo claims filed for various amounts by the owners of the cargo, laden on the steamship at the time of the collision and alleged to have been damaged. All of the claims have been objected to on behalf of Ernest S. Miller, and various claimants have objected to the claims of other claimants. Answers were also filed on behalf of D'Entremont and on behalf of various cargo claimants. Proof of claims was suspended by order of court and the matter is presently on the petition of Ernest S. Miller and on the answers filed on behalf of D'Entremont and the various cargo claimants.

Which of the two craft is at fault? At the first reading of the record we were baffled for the testimony of the crew of the tug was irreconcilable with the testimony of the crew of the Sinaloa.

Counsel on both sides frankly state that the case for decision depends upon which side is favored by the possibilities.

Evidence is to be characterized in the whole and then studied and classified in detail. In the whole, the witnesses on the tug are all uneducated, of not much experience (except Miller, the owner—but he was asleep until just previous to the collision), and seemed to know so little, or failed repeatedly to answer the simplest of questions, and most of which to remain unanswered is inexcusable.

On the other hand, as a whole, the witnesses on the Sinaloa are qualified, licensed for their respective positions, educated academically and trained technically for their special work. They answered all questions promptly and intelligently and in the instances of no response it was because of the want of opportunity to have observed, and consequently to have known.

The strong, electrically-powered searchlight of the tug was thrown—and twice—on the Sinaloa, preventing the pilot, navigators and watcher from evading the collision. We believe that the danger signal by the whistle's successive blasts to have been given by the Sinaloa. It is patent that the Sinaloa gave first the single blast, replied to by the tug, indicating a port to port passage. The fact that the collision occurred means that there must have been trouble,—then why not the blast of alarm? Why not a complaint as against the searchlight play on the Sinaloa?

If we were to believe the evidence of the witnesses on the tug-boat, that the prow of the tug was within 10 feet of its right bank, and that there was no disarray in its towing arrangement, there would have been no accident and the Sinaloa would have come through and not been hit. We cannot believe that the Sinaloa was so much out of its way as to have crossed the middle line so far that its prow struck the port corner of the first barge.

In the overall examination, we should also consider that the bank of the canal which the Sinaloa had at its right, was well delimited and that the ship had the outer bend of the turn, whilst on the other hand, the right bank of the tug-boat was not delimited—for the canal on that side spread out of its regular deepened banks over a relatively wide area. So, it was an expanse of water to the right of the tug-boat. There is nothing in the record which shows any buoys, lights or posts to mark the bank of the submerged, deep part of the channel.

On the one hand, we must note that the S. S. Sinaloa was well designed and a seaworthy craft and readily maneuverable. On the other hand, we must note that this tug with its two barges was 230 feet long. The barges were of steel and contained the great mass of 16,000 barrels of oil. The tug was being navigated in a very difficult situation, with all factors increasing against it, as previously explained. It was only 42 feet long, with a beam of only 13 feet and a draft of only 3.2 feet, equipped with a Diesel engine of only 150 horsepower. It lost control entirely, especially when, by

the clear preponderance of the evidence, its tow line broke. Or, it is well within the probabilities that its tow line was actually 160 feet long all the time and not 40 feet long as testified to by the tug men.

The tug-boat, drawing with it these two heavily-laden barges, and with an engine of only 150 horsepower, in attempting. to make the turn to the right, bringing into play the tangential force of this great mass, even though the acceleration factor was only two or three miles, was unable to hug the channel on its right-hand side. It and the barges went, in part if not in whole, across the middle of this slim 250-foot channel, and thus became an obstruction to the Sinaloa's safe passage on its right-hand side.

We believe the evidence of the experienced expert who says that the tug was not sufficiently strong to cope with the situation that existed.

Moreover, the slow tide, moving against the tug and its barges, at the rate of about two miles per hour, was another factor forcing the barges into the path of the Sinaloa. This is an additional factor to cause those in charge of the tug to be unable to control the direction of the tug and its heavily-laden barges.

 We determine that it was the fault of the master and owner of the tug in making improper and illegal use of the searchlight. We find it a fact that the searchlight was thrown on the Sinaloa twice and for a period of appreciable time in each instance.

On this subject of the use of searchlights, the Board of Supervising Inspectors has provided as follows: "Any master or pilot of any steam vessel who shall flash or cause to be flashed the rays of the searchlight into the pilot house of a passing vessel shall be deemed guilty of misconduct and shall be liable to have his license suspended or revoked."

We concede that the above-quoted rule applies to steam vessels and does not specifically cover the tug powered by a Diesel engine, but in the determination of legal fault, the provision is more than persuasive.

The improper use of the searchlight was testified to by the radio operator who was in an excellent place to show the blinding results of the use of the searchlights, for his point of observation was right beneath the pilot's house and at midship. Since he was blinded where he stood, those in charge of the navigation of the Sinaloa were likewise blinded.

The third officer, acting as watch officer, and being on the navigating bridge before and at the time of the collision, testifies positively that: " * * * the tug was playing the searchlight toward the ship, and, when we came closer, we blew the danger signal. It was very dark and the searchlight blinded us, and when it did, the tug put out the searchlight for the time being. When we got closer and the tug, I would say, was almost up to our bow, he put the searchlight on again, and, of course, it blinded us again."

The compulsory pilot (and, incidentally, this is one officer of the Sinaloa who is not attached to the ship and for that reason is free of that biased interest generally found in seamen for their ship) says, from his place on the navigation bridge, that the tug was using the searchlight, and concludes by saying: " * * * and just before we got to this tow the Ernie Miller put her searchlight on us, and we went by this tow, on our compass, and when we got clear of her we blowed the Ernie Miller five shorts and a long, to notify the Ernie Miller that he was blinding us with a searchlight. When I did he put the searchlight out, and we blowed him one whistle to pass and he answered us one whistle."

And he says again: "Yes, when we got within about two-three hundred feet, she put it back on."

To the question, "What was the effect of that light", his answer is, "We couldn't see nothing but the light".

This is the situation at the very time that the tug in front was being passed and when the navigators of the Sinaloa would have seen the barges in its path in time to avert a collision, but for being totally blinded by the searchlight.

The lookout on the Sinaloa testifies similarly and substantially in accord.

And finally, the master of the Sinaloa said, "our vision was obscured ahead, by

the glare of that searchlight. I would say it was playing from one side of the river to the other. It was thrown in my room below the bridge".

On an issue of fact where the testimony of witnesses is equally clear and unequivocal, the rule of evidence is that those asserting the positive will prevail as against those relating the negative of the issue. In truth, the witnesses on the tug half admit the positive of the issue, for the owner and co-pilot of the tug, though asleep in his bunk until just immediately prior to the collision, said in answer to the question, "Did you see the bank", "Yes, he was right up against the bank with his headlights shining on the bank about 40 feet ahead of the tug." As to the strength of this light, he said that it would throw a beam "approximately a half a mile, very clear".

We are satisfied that the tug, at the moment of passing the larger ship port to port, upon called and confirmed signal, having the undefined expanse of water to its right, was lost. It was not able to locate its right edge of the deepened channel because of so much water to its right. It quite naturally threw its searchlight not only to the right and over the whole expanse of water to its right, but likewise to its left and on the Sinaloa. The tug was attempting to use the position of the Sinaloa as a means of guidance to its navigation.

We are convinced from the preponderance of the evidence, as previously stated, that the tug got into a situation where accurate and close navigation was necessary, and as the result of the coincidence of several factors, all of which have been enumerated, lost control of itself and the two barges. The two barges moved across and into the path of the Sinaloa, and the Sinaloa's last chance of evading the collision, if it ever had any, was denied it by the blinding searchlight, thrown on the piloting and navigating section of the ship.

The other members of the crew of the tug, of course, deny the use of the glaring searchlight to the left, but all admit that it was being used constantly in search of the tug's right bank, difficult to locate because covered by water.

The next fault in which we find the tug is not as clearly and definitely proved as its fault in the use of the glaring searchlight. Section 7 of the River and Harbor Act of August 8, 1917, 33 U.S.C.A. § 1, under which the Secretary of War promulgated certain regulations affecting the Lake Charles Deep Water Channel, among which there is regulation No. 5(d), provides in the instant case for two tow lines in the handling of the barges. The Ernie Miller was proceeding with one tow line. We have gathered that under a subsequent regulation the tow of the tug on a hawser and a bridle (one tow line) was permitted.

Furthermore, the compulsory pilot (a disinterested member of the crew) aboard the Sinaloa, testified as follows:

"Q. Captain, as soon as you were able to see the barges did you see anything about the tow line or hawser that the Ernie Miller was towing these barges? A. Yes, he was towing with a short bridle and a long hawser. And just about the time the ship hit the barges or just before, the port side of his bridle broke. (Tr. 77).

"Q. Captain, What is your estimate as to the length of this tow-line that the Ernie Miller had? A. I judge about 170 feet." (Tr. 79).

In line with this evidence, two other officers of the Sinaloa testify as to where they stood on the ship, how far alongside the tug had come before the crash occurred, which proved with arithmetical certitude that the tow line was not 40 feet but at least 160 feet. The maximum effort of the 150 horsepower engine of the Ernie Miller to bring the two barges around the point had broken the port side of the towing bridle—thus the barges naturally went across the allotted path of the Sinaloa.

Furthermore, if the Sinaloa had smelled the bank, which naturally would cause its prow to shift quickly to the left and run the ship into and across the path of the tug, and the order of hard right wheel was given, this order, if followed, would have directed the ship's course from this accident and to the right. Then, there would have been no accident, for "to smell the bank", the S.S. Sinaloa must be placed near its

right-side bank and the hard right wheel order would keep the ship out of the path of the tug; if not, then the tug was way over and across the path of the S.S. Sinaloa and the negligence would be on the tug still. Our finding is that the order of hard right wheel was given when the operators of the Sinaloa saw, after being blinded by the searchlight—if not the tug—certainly the barges in its path. The order was given to turn the Sinaloa to the right to evade the impending impact.

Able counsel for petitioner in his explanation says that to direct the course of the S.S. Sinaloa hard to its right "would have been useless and meaningless" unless it was in keeping with his theory; adding further "the ship could not get out of the canal on its right-hand bank." Was the Ernie Miller that far over and across the path of the larger vessel?

Now as to coming "out of the canal": The canal's width is 250 feet; the beams of the two craft are 38 and 13 feet, or a total of 51 feet; leaving a clearance for navigation purposes of 199 feet. There are three openings left, if we assume any space between the two ships and any space between each bank and the nearer ship. One-third of the 199 feet is three spaces of 66 feet each. Granting that the tug and its barges had crossed the middle line and were in the path (at least the barges) of the S.S. Sinaloa, there was still some space to the right of the Sinaloa, between it and the bank. It sought to make use of this space by the order of hard right wheel, with the view of preventing the collision.

Another physical fact of circumstantial value is that the impact was by the left port corner of the tug into the port side of the Sinaloa—we admit not near midship, but about three feet aft of the stem and for a distance back from that point of about 40 feet. We submit that this manner of impact supports our conclusion. The Sinaloa was moving forward but inclining its course to its right and the barge was moving forward but inclining its course to its left (out of control) and thus they collide.

So, we conclude that the preponderance of the evidence is against the petitioner and this conclusion is reached on the premise that the burden of proof to show negligence is on D'Entremont and the cargo claimants.

■ However, as a legal surplusage (factor of safety) to this conclusion, in view of the two violations of statutory regulations (searchlight and towlines), the law as to burden of proof is that the burden is on the tug Ernie Miller to show that neither violation could have been the cause of the collision. This it has not done. Pennsylvania, 19 Wall. 125, 22 L.Ed. 148; Ocean Steamship Co. of Savannah v. United States, 2 Cir., 38 F.2d 782; The Azua, D. C., 56 F.2d 432; affirmed by per curiam, 2 Cir., 56 F.2d at page 434.

At the time of the last oral argument the proctor for the cargo interests stated that he could give one reason that, alone, would cast this case against the S.S. Sinaloa.

■ He claimed that the third assistant engineer of the S.S. Sinaloa, one Edvardsen, had no license; That Edvardsen failed at a crucial time in the navigation of the Sinaloa to observe the order to go astern—instead, Edvardsen says he was going slow ahead at the time of collision.

Edvardsen could not be found for the actual trial, but by stipulation his testimony before the "C" Marine Investigation Board was placed in the case. He testified, in part, after stating that he was on watch, as follows:

"Q. What happened on your watch? A. I was on watch, it was slow ahead. I stood by the reversing engine, and then I just felt it and heard a crash and then I was stop, and put the engine astern.

"Q. How were your engines turning when you felt this crash? A. The engines were turning slow ahead.

"Q. You felt the crash and then you reversed your engines? A. Yes, I got a stop bell and full astern and reversed them, gave them full astern."

First, this, if true, was so immediately just before the collision, a matter of a second or two, that we can not say that the collision would have been averted if Edvardsen had followed the order; there is no proof in the record to show that the Sinaloa placed under the astern movement at

812

the time would have moved back sufficiently, or even at all, to avoid the barges of the Ernie Miller striking the Sinaloa to its port, even if it be just aft of its stem.

Captain Jensen's testimony, at its very end, verifies our interpretation of the imminence of the situation, because of the want of time:

"Q. I seen the barges ahead almost across the channel to our port bow. Just before that time the man on the look-out hollered 'hard starboard'—I told the quartermaster 'hard right'. Is that what you are trying to say? A. Yes.

"Q. How far away were the barges when you gave that order? A. I gave the order before I seen them, very shortly before. I gave that order as soon as he hollered. I had already brought her 5 degrees to the right. When he hollered, I told him 'hard right'.

"Q. When was it that you gave that hard right order? A. When we were about 10 feet from the barges.

"Q. Now Captain, what puzzles me about this diagram is this—if the vessels were substantially in the position you have drawn them here, what possible good would a hard right order do under those circumstances? A. You might clear.

"Q. Even though you are that close to the south bank? A. Yes sir."

We could not cast the navigators of the S.S. Sinaloa for their mistakes or neglect, if any, in this sudden emergency, brought about by the neglect of those on the tug Ernie Miller.

Furthermore, it is shown by the deposition of Mr. Rodenburg, a high official of the company owning the S.S. Sinaloa, that under the Honduranian registry of the Sinaloa, it was not necessary for an engineer to have a license such as is required for vessels under the American flag. Edvardsen had a certificate and was qualified fully under the law of his ship. But above all, Edvardsen's employment record, which is in the transcript, shows that he had long experience and was fully qualified to act in the capacity of third assistant engineer of the S.S. Sinaloa. Rodenburg, as marine superintendent for his company, testified that he was personally acquainted with Edvardsen and knew the engineer to be an able and competent one.

■ Conclusively, the steamship Sinaloa was not unseaworthy because of Edvardsen's employment.

■ A witness for the petitioner, one Teel, is offered as an absolutely disinterested witness. Mr. Teel's testimony is that at the time of the collision he was working for the Barge Transport Company of Beaumont, Texas, as tankman on the barges Estes and Betty. The master of the S.S. Sinaloa sued the Barge Transport Company in the Eastern district of Texas; in turn and in response, the Barge Company filed a petition for exemption from or limitation of liability. This is a matter appearing in the record from the titles of the cases shown on the captions of a majority of the depositions. It is true that the Texas proceedings were settled before the taking of the testimony of Mr. Teel, but he was an employee of a vitally interested party. Accordingly, we cannot classify him as a disinterested witness.

It follows, therefore, that the owner of the Ernie Miller is not entitled to the benefits of the statute granting even the privilege of limitation of liability.

Ernest S. Miller, the petitioner, was master of the tug that he owned, was on it at the time of this collision and all aboard the craft looked to him for orders and instructions.

Furthermore, the two main operators, Miller and Dozier, who steered the tug and tow as co-pilots or co-operators, merely held an operator's license—not the full license from the United States. Their watches were irregular and haphazardly kept.

As to Miller's practical knowledge of the waters being navigated, the point so much stressed by his counsel, the following is taken at page 258 of Miller's deposition:

"Q. What navigation rules and regulations govern navigation in the Lake Charles Canal? A. Well, I don't know whether they are exactly the same as we have out in the Mississippi River or not. I can tell you what they are out there. I suppose they were the same. One of the navigat-

ing board told me they were supposed to be the same."

There is no showing by Miller that he was without full privity and knowledge. He was bound to know of the improper single tow line as he had supervised and made the tow in person. He had been present in the pilot-house of the tug some time prior and, though asleep when most of the trouble occurred, was awake just previous to and during the collision. He was the owner and the master of the tug. The tug was used in a task for which it did not have the power. For this exercise of basically bad judgment the owner and master is directly responsible. See 46 U.S.C.A. § 183 et seq. Continental Insurance Co. v. Sabine Towing Co., 5 Cir., 117 F.2d 694, certiorari denied 313 U.S. 588, 61 S.Ct. 1111, 85 L.Ed. 1543; Silver Line v. United States, 9 Cir., 94 F.2d 776, certiorari denied 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1539. Petition of Sinclair Nav. Co., D. C. N. Y., 27 F.2d 606. In re: Eastern Transportation Co., D. C., 37 F.2d 355.

Judgment will be signed in accordance with the above opinion.